FILED
United States Court of Appeals
Tenth Circuit

June 19, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SANDRA BOYETT, individually and
as personal representative for the
Estate of RAYMOND BOYETT;
JESSICA (BOYETT) PETERSON; and
BRANDY (BOYETT) SORENSON,

Plaintiffs-Appellants,

v.

COUNTY OF WASHINGTON, a
political subdivision of the State of
Utah; WASHINGTON COUNTY
PURGATORY CORRECTIONAL
FACILITY, a political subdivision of
the State of Utah; WASHINGTON
COUNTY SHERIFF, a political
subdivision of the State of Utah; KIRK
SMITH, Sheriff of Washington
County, individually and officially;
ROB TERSIGNI, Chief Deputy Sheriff
of Washington County, individually
and officially; FRED KEIL,
Correctional Officer, individually and
officially; RAY KOUNALIS,
Correctional Officer, individually and
officially; GENE REDFORD,
Correctional Officer, individually and
and officially; JAMES HANSON,
Nurse, individually and officially;
DESTINY HUMMER, Nurse,
individually and officially; DARRYL
McCOY, Nurse, individually and
officially; RANDY McKINNON,
Nurse, individually and officially;
DAVE PATT, Nurse, individually and
officially; SABRINA STEEL, Nurse,

No. 06-4315

(D. of Utah)

(D.C. No. 2:04-CV-1173-PGC)

individually and officially; JON
WORLTON, Clinical Social Worker,
Nurse, individually and officially,

Defendants-Appellees.

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, Chief Judge, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

Raymond Boyett died in Washington County, Utah's Purgatory Correctional Facility a week after being arrested for failing to appear in court for traffic offenses. Before his death, Boyett suffered from—and was treated for—a variety of physical and mental ailments including alcoholism, liver disease, anxiety, and depression. The instant appeal stems from a lawsuit filed by Boyett's surviving family members under 42 U.S.C. § 1983 alleging prison officials caused or contributed to Boyett's death by (1) failing to timely treat injuries, (2) withholding medications and forcibly injecting antipsychotic drugs, and (3) allowing him to be assaulted by unknown guards or medical personnel.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The district court granted summary judgment to all individual Defendants on the basis of qualified immunity. The court also granted summary judgment to Defendant Washington County on the claim of municipal liability. We agree with the district court's decisions, concluding the Boyett family has failed to demonstrate a genuine issue of material fact about whether Defendants were deliberately indifferent to Boyett's serious medical needs, inflicted excessive force, or otherwise violated his federal rights. We also affirm the district court's decision to decline supplemental jurisdiction over the Boyett family's state law claims.

Exercising jurisdiction under 28 U.S.C. § 1291, we therefore affirm.

## I. Background

### A. Factual Background

Boyett died in his cell at the Purgatory Correctional Facility around 5:10 a.m. on September 6, 2003. He had been detained in the facility since August 27. While there, Boyett, age 54, was treated by nurses, a social worker, and a physician's assistant for various physical and mental ailments. After Boyett's death, Dr. Leis, the Utah state medical examiner, performed an autopsy. Dr. Leis concluded the cause of death was occlusive coronary artery disease, with cirrhosis serving as a contributing factor.

Boyett's incarceration at the Purgatory Correctional Facility on August 27 was his second in the span of a week. On August 20, he had been booked into the

facility for a DUI. Prior to booking, a doctor at the Dixie Regional Medical Center (DRMC) examined Boyett and concluded he was healthy enough for jail. The doctor listed alcohol intoxication and recent hernia surgery under "Diagnosis," and recommended Boyett continue his regular dose of the prescription drug Methadone. After spending one day in jail, Boyett was released.

On August 27, Boyett returned to the correctional facility after being picked up on an arrest warrant. Boyett's medical history chart at the facility contained the information supplied by the doctor at the DRMC pertaining to the recent surgery and the Methadone. The chart also indicated Boyett suffered from dental problems, tendon problems, liver disease, hepatitis C, anxiety, and depression. Boyett had also previously broken his neck and continued to live with broken vertebrae. On August 27, Boyett was taking the prescription drugs Celexa, Xanax, and Methadone.

On August 31, four days into his detention, Boyett's health began to deteriorate. Boyett told Correctional Officer Pitcher he was internally bleeding and going comatose. Pitcher alerted Nurse McKinnon who, along with fellow nurse Hanson, examined Boyett. They determined he was not internally bleeding or lapsing into a coma.

The next day, Physician's Assistant Steele further examined Boyett and took a verbal medical history from him to update the facility's files. Steele and

Boyett discussed his recent hernia surgery, his five fractured neck vertebrae, and his alcohol withdrawal and Methadone treatment. After conducting a physical exam of Boyett, Steele concluded his hernia repair had healed. Steele prescribed 500 mg of Naprosyn and 25 mg of Elavil for Boyett's neck and back pain, as well as 0.1 mg of Clonidine to replace his prescription Methadone since Methadone was not allowed in Utah jails.

A day later, on September 2, Boyett again asked to see medical personnel. Boyett told Nurse Hummer he was going to die because of his liver disease. Hummer noted that Boyett had recently seen a doctor and was taking prescribed medications; there was nothing further she thought she could do.

On September 3, Boyett complained to Purgatory staff about his liver, hepatitis, insomnia, and general health. Officer Jessop and his supervisor concluded that because no nurses were then on duty, they could only make a log entry of the incident. Later that same day, Boyett injured himself in a fall down a flight of stairs. Officer Keil was first on the scene and did not notice any bleeding or other obvious injuries. Nurse McCoy also responded and treated Boyett for a small cut on his arm. Boyett was transferred to a medical observation cell, where he could receive more attention from the nursing staff. McCoy stated Boyett fell as a result of becoming dizzy. This could have resulted from Boyett taking more than his prescribed dose of Clonidine. Medical logs show that at 11:58 p.m., Boyett told officers he had fallen for a second time. But

when Nurse Hanson responded, he determined Boyett had not fallen; Boyett simply wanted someone to check on him.

The next day, Boyett submitted an inmate request form seeking a liver transplant from his mother.[1] Boyett was also observed banging his head against the door of his cell during the swing shift (3:00 p.m. – 11:00 p.m.). Because of these disturbing actions, Nurse Hanson injected Boyett with 100 mg of Thorazine, an antipsychotic. Hanson determined Boyett was a danger to himself and would be calmed by the injection.

On September 5, Officer Redford checked on Boyett in his medical observation cell. Redford determined Boyett's mental condition was deteriorating and notified the facility's licensed clinical social worker, Jon Worlton. Worlton reviewed Boyett's medical history, interviewed Boyett, and spoke with Boyett's wife on the telephone. Worlton determined Boyett was psychotic and should be given additional injections of Thorazine. A few hours later, when Officer Kounalis noticed a bloody spot on the back of Boyett's head, he and Officer Redford took Boyett to the infirmary for medical treatment.

Nurse Hanson determined Boyett's head laceration was not serious and washed the wound with clean water. After consultation with Worlton, Hanson also injected Boyett with a second 100 mg of Thorazine to prevent Boyett from

---

[1] Boyett's inmate request form stated, "I need a request to have my mother's liver transplanted into me and then bury my mother here in LaVerkin, UT." R., Vol. 5 at 1549.

harming himself. At 7:45 p.m., Nurse Hummer injected Boyett with a third dose of Thorazine. Staffers then transported Boyett to a suicide watch cell in the booking area of the facility, leaving only a suicide gown and a mattress in the cell.

Early the next morning, at approximately 5:10 a.m., Officer Vernon noticed Boyett lying on the floor and not moving. The officer opened the cell and found Boyett was dead.

Dr. Leis, Utah's Deputy Chief Medical Examiner, conducted an autopsy on Boyett's body 24 hours later. Boyett's left anterior descending coronary artery was 90% occluded. Dr. Leis concluded the cause of death was occlusive coronary artery disease, with cirrhosis contributing significantly to death. The autopsy report also found Boyett's drug and medication levels were within normal limits.

Also shortly after Boyett's death, Washington County Sheriff Kirk Smith began an investigation into the circumstances surrounding the death. FBI agents provided additional assistance. It is not clear from the record, however, what additional information—if any—the investigation revealed.

*B. Procedural History*

The Boyett family brought several causes of action against Washington County and county employees who came into contact with Boyett during his incarceration. Plaintiffs sought damages for federal civil rights violations and state law torts Defendants allegedly committed before and after Boyett's death.

-7-

The principal claims were that jail officials failed to provide adequate medical care, used excessive force, and operated under defective supervisory policies.

In this appeal, the Boyett family challenges: (1) the district court's grant of summary judgment to individual Defendants on the basis of qualified immunity; (2) the district court's grant of summary judgment on municipal liability; and (3) the district court's dismissal of the state law claims.

## II. Qualified Immunity

### A. Standard of Review

The district court granted qualified immunity to Defendants on the Boyett family's claims of deliberate indifference to medical needs, excessive force, and supervisory liability. We review the grant of qualified immunity *de novo*. *See, e.g.*, *Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1150 (10th Cir. 2006).

Officials granted qualified immunity have immunity from suit and from the concomitant burdens of litigation. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). To overcome a grant of qualified immunity, plaintiffs must satisfy a heavy two-part burden by showing: (1) "the defendant's actions violated a constitutional or statutory right" and (2) "the right was clearly established at the time of the defendant's unlawful conduct." *Serna*, 455 F.3d at 1150 (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)). Plaintiffs must "go beyond the pleadings and designate specific facts so as to make a showing

sufficient to establish the existence of an element essential to [their] case."

*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The threshold inquiry in every qualified immunity case is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer[s'] conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201; *see also Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) ("Only if the plaintiff can show a constitutional violation do the courts ask whether the constitutional right was clearly established." (quotation omitted)). If no constitutional right has been violated, our inquiry necessarily ends.

### B. Deliberate Indifference to Serious Medical Needs

#### 1. Legal Framework

The Eighth Amendment provides prisoners the right to be free from cruel and unusual punishments. This right is violated if prison officials show "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A prison official does not violate this standard, however, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Thus, to make out a constitutional deprivation under the deliberate indifference standard, plaintiffs

must prove two elements: (1) objectively, the inmate's medical needs were "sufficiently serious," and (2) subjectively, the prison official acted with a "sufficiently culpable state of mind." *Id.* at 1230–31; *see also Mata*, 427 F.3d at 751.

A medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). A prison official has a sufficiently culpable state of mind if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (concluding "a complaint that a physician has been negligent in diagnosing or treating a medical condition" does not show deliberate indifference).

In cases involving allegations of missed diagnoses or delayed treatment, plaintiffs may establish liability by showing:

(1) a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral, *e.g.*, a family doctor knows that the patient needs delicate hand surgery requiring a specialist but instead of issuing the referral performs the operation himself; (2) a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition, *e.g.*, a gangrenous hand or a serious laceration; [or] (3) a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, *e.g.*, a patient complains of chest pains and the prison official, knowing

-10-

that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell.

*Self*, 439 F.3d at 1232 (citations omitted).

With these principles in mind, we turn to Plaintiffs' allegations of deliberate indifference.

### 2. Application

Plaintiffs claim the officer and nurse Defendants were deliberately indifferent to Boyett's serious medical needs during his time in the Purgatory facility. They point to a plethora of acts and omissions by Defendants: (a) failure to supply a qualified medical provider; (b) failure to provide the medicine and care prescribed by Boyett's treating physicians prior to incarceration; (c) failure to respond to symptoms and complaints regarding internal bleeding; (d) failure to respond to falls and seizures on September 3; (e) failure to treat Boyett's head laceration; (f) improper injection of antipsychotic medication; and (g) failure to prevent Boyett's death.[2]

---

[2] Plaintiffs' brief is far from a model of clarity; nevertheless, we have attempted to discern the main arguments. We believe any additional claims—such as Defendants' failing to follow medical conditions imposed upon the jailing of Boyett, failing to provide adequate and proper medication, and failing to examine Boyett's medical records (Aplt. Br. 28)—are encompassed within the seven broad claims we have laid out above.

We address the claims in order.

*a. Failure to supply a qualified medical provider*

Plaintiffs have not shown how any individual officer or nurse failed to supply a qualified medical provider to Boyett. As a preliminary matter, there is no *per se* requirement that a jail provide its inmates around-the-clock access to a medical doctor. While jailers are ultimately responsible for their inmates' medical needs, *Farmer v. Brennan*, 511 U.S. at 833–34, they can provide that care in a variety of ways, including access to trained personnel such as guards in the first instance, nurses, and physicians' assistants. The Eighth Amendment requires nothing more as a general matter. *See, e.g., Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (en banc) (reversing lower court's order that a penitentiary must hire two medical doctors to meet minimum standards of prison medical care under the Eighth Amendment); *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (noting state prison officials retain "wide discretion in the operation of prison facilities"). While access to a medical doctor may be necessary in certain situations, *e.g., Sealock*, 218 F.3d at 1210–11, no constitutional violation occurs unless medical care is intentionally or recklessly denied. *E.g., Estelle*, 429 U.S. at 104–05 (discussing prison guards "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed").

Here, Washington County supplied qualified nurses, a licensed clinical social worker, and a licensed physician's assistant to provide immediate medical

-12-

care to inmates. All of these individuals acted in accordance with the dictates of the Eighth Amendment by promptly and diligently assessing Boyett's medical condition and taking reasonable steps in light of their evaluations. The record is replete with examples of correctional officers notifying the nursing staff about Boyett's medical needs in a timely manner. Those nurses promptly responded to the calls and treated Boyett in a professional way. Physician's Assistant Steele and Licensed Clinical Social Worker Worlton also supplied timely medical care to Boyett. In fact, over a six-day period (August 31 to September 5), Boyett was examined by at least six different staffers with medical training on no less than eight separate occasions. These officials conducted examinations, treated wounds, and administered medications based on their diagnoses.

In short, Plaintiffs have not demonstrated the existence of a genuine issue of material fact pointing to deliberate indifference by any Defendant in failing to provide a qualified medical provider to Boyett.

*b. Failure to provide the medicine and care prescribed by Boyett's treating physicians prior to incarceration*

Plaintiffs contend the decision by Washington County officials to take away Boyett's prescription Methadone when he entered the facility violated his rights.[3] Boyett's doctor had prescribed the Methadone to treat his alcohol

_____

[3] Boyett was also taking Celexa and Xanax before he entered the Washington County facility. Plaintiffs have failed to show whether these were prescribed by Boyett's doctor and, if so, whether they were taken away by

(continued...)

-13-

withdrawal symptoms, but because Methadone is a narcotic, he was not allowed to keep it in the jail. To replace the Methadone, Physician's Assistant Steele prescribed 0.1 mg of Clonidine to be taken twice daily. Steele's prescription of substitute medication for Boyett does not demonstrate deliberate indifference. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) ("[A] prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment." (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997))); *Perkins v. Kansas Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999) ("[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.").

Plaintiffs also complain officials inadequately treated Boyett's hernia repair. On August 20, Boyett's outside doctor told Washington County officials Boyett had undergone surgery to repair a hernia about one month before entering the facility. Boyett also informed officers and nurses of this fact. When Physician's Assistant Steele conducted a physical examination of Boyett on September 1, she determined he was healed. Even if we assume the diagnosis was both negligent and harmful, Steele's conduct would not rise to the level of a constitutional violation because there is no evidence she acted with the requisite

[3](...continued)
Washington County officials. Plaintiffs have therefore waived review of any claim with regard to these drugs.

-14-

culpable state of mind.  *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").  Plaintiffs have failed to put forth evidence Steele knew of "a substantial risk of serious harm," and "consciously disregard[ed]" it.  *Self*, 439 F.3d at 1231.

*c. Failure to respond to symptoms and complaints regarding internal bleeding*

On August 31, at 12:49 p.m., Boyett told Officer Pitcher he thought he was bleeding internally.  Pitcher alerted Nurse McKinnon, but neither McKinnon nor any other nurse responded.  Three hours later, Boyett told Officer Ence he thought he was hemorrhaging.  Soon thereafter, Nurses McKinnon and Hanson responded and Boyett told them he was going comatose and had spit-up blood.  After conducting a thorough examination of Boyett, McKinnon and Hanson concluded Boyett was not lapsing into a coma or suffering from internal bleeding.  The nurses instructed Boyett to drink six to eight glasses of water per day.

Although the three-hour delay in responding to Boyett's claims of internal bleeding is troubling, it does not constitute deliberate indifference to a serious medical need because the delay caused Boyett no harm.  "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm."  *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quotation omitted); *see also Mata*, 427 F.3d at 753 (noting prisoner's injury must be "sufficiently serious" to constitute deliberate

indifference). Boyett was not experiencing internal bleeding or any other medical problem at that time. The autopsy performed after Boyett's death showed no evidence of internal bleeding or related ailments arising from this incident.

*d. Failure to respond to falls and seizures on September 3*

In treating Boyett after his fall on September 3, Washington County officials did not violate Boyett's constitutional rights. Nurse McCoy evaluated Boyett soon after the fall and did not discover any serious injuries. Officer Keil, who was also on the scene, did not notice any bleeding or other injuries. Because officials thought the fall was due to a seizure or other medical condition, they transferred Boyett to a medical observation cell for continued monitoring. After Boyett was moved to the observation cell, nurses determined no additional treatment was necessary.

The Purgatory staffers' considered medical judgments did not violate Boyett's constitutional rights. No Eighth Amendment violation can arise from a situation where "a doctor merely exercises his considered medical judgment" and "resolves the question whether additional diagnostic techniques or forms of treatment" are required. *Self*, 439 F.3d at 1232; *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice and as such the proper forum is the state court."). None of the officials involved in the decisions to move Boyett to a special cell and refrain

from pursuing additional treatment evidenced deliberate indifference to his medical needs. Indeed, the decision to move Boyett to a medical observation cell evidenced concern for—not deliberate indifference to—Boyett's health and well-being.

### e. Failure to treat Boyett's head laceration

Officers Kounalis and Redford observed Boyett's head laceration the evening of September 5. The laceration likely stemmed from Boyett banging his head against the door of his cell during the prior day's swing shift (3:00 p.m. – 11:00 p.m.). Nurse Hanson treated Boyett's laceration by washing it with clean water, and determining sutures were not needed. Social worker Worlton also evaluated Boyett at that time, and determined Boyett appeared psychotic and should be given antipsychotic medication.

Although the Plaintiffs now complain Boyett should have been treated by a doctor or given sutures for his head injury, these post-hoc opinions do not prove Hanson and Worlton violated the Constitution. Because the injury was not so serious that "even a lay person would easily recognize the necessity for a doctor's attention," *Sealock*, 218 F.3d at 1209, Hanson and Worlton were not reckless in their treatment. Hanson made an on-the-spot determination that the laceration did not require sutures. "[T]he subjective component [of deliberate indifference] is not satisfied, absent an extraordinary degree of neglect, where a [prison] doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232.

-17-

*f. Improper injection of antipsychotic medication*

The prison's use of the antipsychotic drug Thorazine did not violate Boyett's constitutional rights. Washington County officials injected Boyett with this antipsychotic on three occasions. Nurse Hanson administered the first 100 mg injection on September 4, after Hanson concluded Boyett appeared dangerous. Hanson administered a second 100 mg dose on September 5 after he and Worlton jointly determined Boyett appeared psychotic and was a danger to himself and others. Nurse Hummer gave Boyett a third 100 mg injection of Thorazine a few hours later on the evening of September 5.

Each of the three Thorazine injections were made pursuant to a doctor's standing order. While the standing order is not part of the record, Nurse Hummer testified as to the policy's contours. According to Hummer, Purgatory medical staff had a standing order to inject an inmate with Thorazine when the following three conditions were met: (1) the inmate was dangerous or threatening; (2) injecting Thorazine was the best alternative available; and (3) an individualized assessment of the inmate's medical history weighed in favor of Thorazine treatment. R., Vol. 2 at 524. The Thorazine policy exists primarily to prevent inmates from harming themselves. The policy provides Washington County officials the ability to quickly respond to a dangerous situation, and is administered under the supervision of medical personnel and only given to inmates showing signs of serious mental disturbance.

That the policy allows Thorazine to be administered without inmate consent does not by itself present a constitutional problem. First of all, the record does not suggest that Boyett objected to the drug treatment or that it was administered against his will. Moreover, as the Supreme Court has held, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). This makes good sense, for where an inmate is a danger to himself or others, an involuntary medication policy may be considerably more humane than a policy disallowing the practice altogether.[4] Prison officials have a duty to care for their inmate population, and using antipsychotic medications is an appropriate medical response in certain situations. *Cf. Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (concluding medical personnel, "acting in accordance with sound medical judgment and with the prisoner's best interests in mind," may order an emergency injection of Thorazine); *Harper*, 494 U.S. at 231 ("Though it cannot be

---

[4] We note that if prison officials had *not* given Boyett the Thorazine injections after witnessing his self-destructive behavior, Plaintiffs may have alleged Defendants were deliberately indifferent in failing to protect Boyett from himself. *See Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (concluding if prison doctor "had not ordered the single dose of Thorazine" to mentally deteriorating prisoner "it is not unlikely that [doctor] would now be facing a lawsuit by [prisoner] claiming that he was deliberately indifferent to his serious medical needs").

-19-

doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms."). The jail's Thorazine policy alone does not demonstrate deliberate indifference.

Although Plaintiffs argue a medical doctor should have made the Thorazine decision, they have not shown how this is constitutionally compelled. As we have noted, a prison need not have physicians on site around-the-clock. *See Hoptowit*, 682 F.2d at 1253; *Perkins*, 165 F.3d at 811. It is enough that a prison make medical personnel, including doctors, available to help with ongoing medical needs, or meet emergencies. In light of this reality, Washington County's policy provides for prompt action by on-site medical staff, including nurses, licensed clinical social workers, and physicians' assistants. Other medical personnel, including doctors, are available as necessary. *See* R., Vol. 5 at 1481 (Physician's Assistant Steele testifying her supervising doctor "was available by phone twenty-four hours a day if I had a question").

Nor do we see a constitutional violation based on the manner in which the Thorazine was administered. Boyett's three Thorazine injections were given in accordance with the standing order, which required (1) a determination of dangerousness, (2) Thorazine being the best course of action, and (3) an individualized assessment of the inmate. There is no dispute Nurse Hanson administered the first injection after determining Boyett posed a danger to himself.

-20-

It also appears Hanson determined Thorazine was the best method of treatment and an individualized assessment of Boyett's medical history weighed in favor of Thorazine treatment. Although strapping Boyett down to a bed or engaging in some other treatment may also have been helpful, there is no indication Thorazine was not the best treatment option.[5]

The second and third injections also complied with the policy. The second Thorazine injection was given by Nurse Hanson on September 5. This injection came after consultation with Licensed Clinical Social Worker Worlton. Worlton had spoken with Boyett's wife regarding Boyett's medical history and consulted Boyett's medical charts before determining Thorazine was the best course of treatment. Nurse Hummer gave Boyett a third shot of Thorazine later that night. Plaintiffs point to no record evidence sufficient to carry their burden of showing Nurse Hummer ran afoul of the standing order.

Again, nothing in the record suggests that Boyett objected to any of the injections. Thorazine is used in institutional settings and accepted by mentally

---

[5] *See* Steven K. Erickson, *The Myth of Mental Disorder: Transsubstantive Behavior and Taxometric Psychiatry*, 41 Akron L. Rev. 67, 101–02 (2008) (describing "[t]he introduction of Thorazine" as "monumental to psychiatry" because "it brought hope to the severely mentally ill in a manner that was manifestly obvious"); Thomas G. Gutheil, M.D. and Paul S. Appelbaum, M.D., *"Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication*, 12 Hofstra L. Rev. 77, 93–97 (Fall 1983) (noting cases in which a defendant was given Thorazine to regain cognitive functionality, sanity, and/or competency to stand trial).

unstable individuals in precisely Boyett's circumstances. In fact, Plaintiffs concede that, at least for the third treatment, "Boyett was not offensive or combative, and in fact, he complied with the order of the jailers to sit still and allow himself to be injected." Aplt. Br. 22–23.

In sum, Plaintiffs have not shown how Washington County's antipsychotic injections policy or the injections in this case evidenced deliberate indifference to Boyett's medical needs. Plaintiffs have pointed to nothing in the record suggesting Boyett objected to the medication or that the nurses unreasonably believed that Thorazine was an inappropriate means of addressing Boyett's indications of mental illness.

*g. Failure to prevent Boyett's death*

Finally, Plaintiffs contend prison officials deliberately failed to prevent Boyett's death. Purgatory officials found Boyett dead in his cell on the morning of September 6. We have outlined above the steps taken by prison officials to address Boyett's medical ailments and complaints during the preceding week. On this record, it is obvious jail officials responded reasonably to Boyett's medical condition prior to his death, and therefore did not violate Boyett's constitutional rights. "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 844–45.

Dr. Leis, the medical examiner, concluded Boyett died of occlusive coronary artery disease. There is no reason to believe any prison official should have been

aware of this medical risk. Boyett had not documented the disease on his medical history paperwork, nor had he shown any symptoms of the disease before he died.

Even if Boyett's other medical conditions somehow contributed to his death, Plaintiffs point to no evidence in the record that prison officials: (1) recklessly misdiagnosed or ignored medical problems; (2) delayed providing medical treatment; or (3) denied altogether access to medical personnel or medication. *See Self*, 439 F.3d at 1232; *Mata*, 427 F.3d at 753. While Plaintiffs ask us to surmise Boyett was not treated after a cell room assault perpetuated by either prison officials or other inmates, there is no evidence of an assault or that prison officials were aware of these injuries and failed to treat them.

\* \* \*

In sum, Plaintiffs have failed to point to material disputed facts sufficient to reverse the district court's grant of summary judgment in favor of Defendants. Plaintiffs have not shown prison officials were deliberately indifferent to Boyett's serious medical needs.

## C. *Excessive Force*

### 1. Legal Framework

A claim arises under § 1983 if prison officials use force more excessive than necessary to preserve safety and discipline in the prison facility. The core inquiry for an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

*Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.").

An excessive force claim has two prongs: "(1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003). To defeat summary judgment, plaintiffs must support their claim with more than conjecture and speculation. *E.g.*, *Self*, 439 F.3d at 1236. "Unsubstantiated allegations carry no probative weight" in summary judgment proceedings. *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

2. Application

Plaintiffs contend prison officials assaulted Boyett while he was in jail. They point to the testimony of three expert witnesses: Drs. Lara, Lovell, and Graham to support their theory. The district court excluded evidence from those experts based on concerns about their reliability under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993). After excluding the expert evidence, the district court concluded Plaintiffs failed to establish an affirmative link between the prison guards and Boyett's injuries.

Plaintiffs' theory is that Boyett's rib, rectum, and head injuries were not self-inflicted. They posit Officer Kounalis and perhaps another officer assaulted Boyett sometime between 5:00 p.m. on September 5 and his death the next morning. No direct evidence supports this theory; it rest entirely on (1) an expert report theorizing the injuries could not be self-inflicted, and (2) circumstantial inferences one of the prison guards must have been alone with Boyett and beat him while no one else was looking. We agree with the district court the record does not support Plaintiffs' theory.

One of the proffered medical experts, Dr. Lara, stated Boyett died as a result of: (1) trauma received prior to his death; (2) oversedation from major tranquilizers of a patient with compromised liver functions; and (3) denial of basic emergency care. Dr. Lara posited Boyett was suffering from liver failure, traumatic injuries (i.e., chest trauma, rectal tear, and internal bleeding), and probable overwhelming sepsis. Dr. Lara also stated videos taken of Boyett before his death showed he was able to lift his arms and move about in a manner that would have been impossible had Boyett been suffering from the injuries discovered at his death.

-25-

Another medical expert, Dr. Lovell, opined Boyett's injuries were more likely caused by the guards than by Boyett himself. Dr. Lovell's expert report stated, "The severe wound on posterior scalp is in such a position that it was more likely than not caused by an external blow rather than a fall." R., Vol. 11 at 3390. Dr. Lovell also stated the linear tear in Boyett's anus "was undoubtedly penetration with a blunt foreign body." *Id.* Nevertheless, Dr. Lovell ultimately agreed with the medical examiner that Boyett died of "cardiac arrest." *Id.* at 3391.

A former state medical examiner, Dr. Graham, performed an autopsy on Boyett's body more than one month after Dr. Leis's official autopsy had been completed. Dr. Graham's autopsy report contained an "anatomical summary" listing the most important findings of the autopsy. Those findings were: (1) multiple cutaneous contusions and abrasions, including forehead, left hand, right foreleg, right and left foot; (2) multiple rib fractures (L 8, 9, 10, 11), lacerations (parietal pleura), and intercostal hematomas; (3) laceration (anus); (4) multiple scalp contusions; (5) coronary artery atherosclerosis-stenosis; (6) cirrhosis of the liver; (7) pulmonary emphysema; and (8) hematoma (omentum). R., Vol. 11 at 2766. According to Plaintiffs, the conclusion that Washington County officials inflicted serious and deadly injury upon Boyett flows inescapably from the medical observations of these three experts. We disagree.

Even if all three of these experts' testimony and reports were admitted into evidence, there would be no genuine issue of material fact regarding Defendants'

use of excessive force.  None of these experts supplies evidence tending to show either the mechanism or perpetrator of Boyett's injuries.  Plaintiffs have failed in their burden of showing an affirmative link between the injuries complained of and the conduct of the Defendants.  *See Serna*, 455 F.3d at 1152–53 (requiring plaintiff to show an "affirmative link" between the defendant's actions and a constitutional violation); *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003) (same).

Plaintiffs attempt to overcome their lack of evidence by presenting a theory analogous to the common law notion of *res ipsa loquitur*.  "A res ipsa loquitur case is ordinarily merely one kind of case of circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it."  Restatement (Second) of Torts § 328D, cmt. b (1965).  The problem with reliance on this theory is that it  can, at most, help Plaintiffs show negligence.  Plaintiffs have the burden of proving more than negligence, however; Plaintiffs must prove force was applied to Boyett's body "maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7.  A finding of negligent medical care provides no help in that regard.

Evaluating all three of these experts' testimony, along with the rest of the evidence in the record, we conclude the expert testimony and circumstantial evidence fail to raise a material question of fact as to whether Officer Kounalis or another officer assaulted Boyett.  The reports focus on the extent and severity of

the injuries, while almost entirely omitting their causes (other than to suggest they were not self-inflicted). While the injuries are undoubtedly troubling, and their origins a mystery, the experts provide no evidence on the crucial question of whether one of the Defendants committed them.[6] In fact, Plaintiffs point to no evidence in the record tending to show that either Kounalis or another officer was alone with Boyett at a time they could have committed the injuries.

In contradistinction to Plaintiffs' unsupported theory, the record evidence suggests Boyett was never physically abused. The evidence shows: (1) Officer Kounalis discovered Boyett's head injury at 5:00 p.m. on September 5; (2) Officers Kounalis and Redford transported Boyett to the infirmary for treatment; (3) Boyett did not complain of rib or rectum injuries to anyone at that time; (4) Boyett was on powerful pain medication (500 mg of Naprosyn) for other ailments; (5) Boyett was given a Thorazine injection and placed in a suicide watch cell at 7:45 p.m.; (6) the suicide watch cell, located directly behind the booking station, is the most public place in the prison; (7) the suicide watch cell was monitored at all times by two officers at the booking station; and (8) Boyett was observed walking around his cell and using the toilet several times between midnight and 3:00 a.m.[7]

---

[6] Evidence in the record suggests Boyett fell down some stairs on September 3 and may have injured his ribs and rectum then. The record also suggests Boyett's head wound was caused by Boyett repeatedly beating his head against the observation cell's wall or bars.

[7] Plaintiffs suggest Defendants conspired to conceal the beating, but this

(continued...)

-28-

The evidence does not show how any Defendant had the time or opportunity to inflict severe wounds upon Boyett in the hours immediately preceding his death.

In sum, the Boyett family has not pointed to sufficient record evidence to support their theory Officer Kounalis or another Defendant inflicted fatal injuries on Boyett the night of September 5. At the summary judgment stage, Plaintiffs must point to facts that show a particular Defendant caused the injuries with a culpable state of mind. *See, e.g.*, *Bones*, 366 F.3d at 875 ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."). They have failed to do so here.

*D. Supervisory Liability*

To hold a supervisor liable under § 1983, a plaintiff must show the supervisor's deliberate, intentional conduct amounted to a violation of plaintiff's constitutional rights. Government officials are not vicariously liable for the misconduct of their subordinates. "There is no concept of strict supervisor liability under § 1983." *Serna*, 455 F.3d at 1151 (quoting *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)). The supervisor must be "personally involved" in the constitutional violation. *Id.*

---

[7](...continued)
theory of group liability is not supported by the record. Instead, the record shows extensive attention to Boyett's medical needs for the entire period of his incarceration. The jail-house documentation that exists shows Boyett was monitored throughout the evening of his death, and no one had the opportunity to assault him while he was in the prison's suicide watch cell.

Plaintiffs have failed to present any evidence Sheriff Smith or Chief Nurse Patt used excessive force or evidenced deliberate indifference rising to the level of a constitutional violation. They have not even attempted to show how these county supervisors were personally involved in any constitutional violation. Accordingly, we affirm the grant of summary judgment in favor of both supervisor Defendants. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting summary judgment is appropriate when nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### III. Municipal Liability

Municipalities are not vicariously liable for the misconduct of their employees. Municipal liability may be imposed under § 1983 only if the municipality itself is responsible for the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). As relevant here, a municipality may be responsible for a constitutional violation when: (1) individuals with final decision-making authority for the municipality create an unconstitutional policy or practice, or (2) the municipality's failure to train its employees reflects a deliberate indifference to constitutionally protected rights. *See id.* at 389. In either case, the municipality must be the "moving force behind the constitutional violation." *Id.* (alterations omitted).

Plaintiffs base their claims of municipal liability on two Washington County policies. Neither violates the Constitution.

The first policy is the county's supposed policy or practice of refusing to treat the wounds and ailments of Purgatory Correctional Facility inmates. There is no evidence of this policy or practice. Instead, the county's policy was to have a full-time nursing staff, as well as a part-time physician's assistant, on site at the facility. Other medical personnel, including Steele's supervising physician, were on call. In light of our conclusion that county employees appropriately evaluated and treated all of Boyett's known ailments while he was incarcerated, this policy cannot support a claim of municipal liability.

The second policy is the county's allegedly unconstitutional decision to allow Purgatory officials to inject inmates with Thorazine in unknown amounts and frequency and without keeping adequate records. Plaintiffs' claim fails because they have not shown that—if in fact a policy to underreport exists—the policy was causally related to Boyett's injuries. *See, e.g.*, *Harris*, 489 U.S. at 391 (noting that "for liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury").

Boyett died either of a combination of trauma, broken ribs, and lack of medical treatment (Plaintiffs' theory) or a heart attack (Dr. Leis's conclusion). In neither case was the injection of an antipsychotic medication a cause of his injuries or death. Indeed, Dr. Leis's uncontroverted autopsy report showed no

elevated levels of any medications or other drugs in Boyett's body, and none of Plaintiffs' expert witnesses opined that Thorazine directly caused Boyett's death. Nor do any of the Plaintiffs' allegations, even if true, point to a policy of deliberate indifference to Boyett's serious medical needs. Plaintiffs have thus failed to meet the threshold standard of culpability and causation required to hold the county liable. *Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003) (recognizing plaintiffs seeking to impose municipal liability must prove a municipal policy "actually caused" their injuries); *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999) (holding plaintiff "must prove that the [county's] deficiency in training actually caused his jailer to act with deliberate indifference to his safety").

Plaintiffs' two claims against Washington County fail for an additional, independent reason: the lack of a constitutional violation by any of the county's employees. Without proof of an underlying constitutional violation by a county employee, there can be no county liability based on a county policy. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008) ("[W]ithout the

predicate constitutional harm inflicted by an officer, no municipal liability exists.").

## IV.  State Law Claims

The district court declined to exercise supplemental jurisdiction over the Plaintiffs' state law claims.  By failing to specifically point to any error in the district court's decision, they have waived review of this issue on appeal.  *See, e.g.*, *Hernandez v. Starbuck*, 69 F.3d 1089, 1093 (10th Cir. 1995) (noting appellant has the burden of drawing this court's attention to error below and court will not manufacture a party's arguments on appeal).

## V.  Conclusion

For the reasons set forth above, we AFFIRM the district court's decision.

Entered for the Court,

Timothy M. Tymkovich
Circuit Judge
