**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**September 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

NOLEEN PAUGH and DONALD
PAUGH, as heirs of Coby Lee Paugh,

    Plaintiffs,

and

TRISTEN CALDER, as personal
representative of the estate of Coby Lee
Paugh,

    Plaintiff - Appellee,

v.

UINTAH COUNTY; KORI ANDERSON;
DAN BUNNELL; KYLE FULLER;
TYLER CONLEY; RICHARD GOWEN,

    Defendants - Appellants,

and

JUSTIN RIDDLE,

    Defendant.

No. 21-4067

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:17-CV-01249-JNP-CMR)**
_____

Frank D. Mylar (Andrew R. Hopkins with him on the briefs), of Mylar Law, P.C., Salt
Lake City, Utah, for Defendants-Appellants.

C. Peter Sorensen (Robert B. Sykes and Christina D. Isom with him on the briefs), of Sykes McAllister Law Offices, Salt Lake City, Utah, for Plaintiffs-Appellees.

_____

Before **HOLMES**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Coby Lee Paugh died from complications related to alcohol withdrawal while being held in pretrial detention at Uintah County Jail in Vernal, Utah. His estate sued Uintah County and several of its jail officials under 42 U.S.C. § 1983, alleging violations of Paugh's constitutional rights.

The County and its jail officials—Kori Anderson, Dan Bunnell, Kyle Fuller, Tyler Conley, Richard Gowen, and Justin Riddle—moved for summary judgment, with the jail officials asserting qualified immunity. In a thorough order, the district court granted qualified immunity for Riddle,[1] but it denied qualified immunity for Anderson, Bunnell, Fuller, Conley, and Gowen (collectively, "Individual Defendants"). It also denied the County's motion for summary judgment.

The Individual Defendants and the County have now filed this interlocutory appeal. The Individual Defendants challenge the district court's denial of qualified immunity, and the County asks us to exercise pendent appellate jurisdiction and reverse the court's denial of its motion for summary judgment.

---

[1] The Estate does not dispute Riddle's dismissal. *See* R. vol. 2 at 80 (explaining that the Estate "concede[s] that there is insufficient evidence from which a jury could conclude that Riddle was deliberately indifferent to Paugh's serious medical need" (citation omitted)).

We hold that the Individual Defendants are not entitled to qualified immunity. We thus affirm the district court's denial of the Individual Defendants' motion for summary judgment. We do not consider the County's appeal, because we lack jurisdiction to do so.

## BACKGROUND

I.    **Factual Background**[2]

A.    **Paugh's Arrest and Hospital Visit**

The underlying events of this case are tragic. For years, Paugh suffered from chronic alcoholism. In March 2015, Paugh pleaded guilty to an alcohol-related offense and was placed on supervised probation. One condition of Paugh's probation barred him from consuming alcohol for six months.

After going on a multiday drinking binge, Paugh realized that he needed help. So in the early morning of July 24, 2015, he turned himself over to the Vernal Police Department for his probation violation. At the time of his arrest, Paugh had a blood-alcohol concentration ("BAC") of .324. This BAC veers "dangerously" close to "alcohol overdose levels." R. vol. 2 at 9.

Immediately after arresting him, Vernal police officers took Paugh to Ashley Regional Medical Center ("ARMC"), seeking medical clearance to admit him to Uintah County Jail. At about 1:30 a.m., Dr. Aaron Bradbury examined Paugh and

---

[2] "Because our interlocutory review of an order denying qualified immunity is typically limited to issues of law, this factual history is drawn from the district court's recitation of the facts." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1174 n.3 (10th Cir. 2020).

diagnosed him as suffering from chronic alcoholism and alcohol withdrawal. Though Dr. Bradbury did not give Paugh any medication at that time, he prescribed Paugh Chlordiazepoxide (commonly known as Librium) to help mitigate Paugh's alcohol-withdrawal symptoms.

Ultimately, Dr. Bradbury found Paugh "currently stable and safe for incarceration." *Id.* at 10 (citation omitted). But he warned the Vernal police officers that if Paugh's "alcohol withdrawal condition got any worse they'd have to bring him back to ARMC." *Id.* (internal quotations and citation omitted). Indeed, according to the discharge instructions given to the Vernal police officers, jail officials were to administer Librium to Paugh "[a]s needed" and to bring him back to the hospital if his condition worsened.[3] R. vol. 3 at 190.

Around 2:10 a.m., Dr. Bradbury discharged Paugh from ARMC, and Paugh was taken to Uintah County Jail.

### B.   Paugh's Arrival at the Jail and Night Shift on July 24, 2015 (2:20 a.m. to 6:00 a.m.)

At about 2:20 a.m., Paugh arrived at Uintah County Jail. Three Individual Defendants—Bunnell, Anderson, and Riddle—were working a 6:00 p.m. to 6:00 a.m. shift. Only Anderson and Bunnell interacted with Paugh during this shift. It was

---

[3] Dr. Bradbury testified at his deposition that in discharging Paugh, he had expected the jail officials to "regularly observe and monitor Paugh for signs of gradually worsening alcohol withdrawal." R. vol. 2 at 10 (internal quotations and citation omitted). These signs included "vomiting, becoming pale or sweaty, uncontrolled shaking or movement (tremors), having a seizure or a fever, becoming lightheaded or faint, or experiencing confusion, lack of coordination, or increased anxiety and restlessness." *Id.* (internal quotations and citation omitted).

Anderson's first night as a shift supervisor. Bunnell was the designated medical

official, making him responsible for administering medication to the inmates.[4]

When the Vernal police officers turned Paugh over to Anderson and Bunnell,

Paugh "was walking, talking[, and] [d]idn't seem unsteady on his feet." R. vol. 3

at 135. In fact, Anderson described Paugh as seeming "just fine."[5] *Id.* at 85.

The Vernal police officers apprised Anderson and Bunnell that Paugh had a

BAC of .324 when he turned himself in, that they had immediately taken him to the

hospital, and that Dr. Bradbury had prescribed him Librium. The officers then gave

Dr. Bradbury's written discharge instructions to Anderson and Bunnell, which the

two placed into Paugh's file. The Vernal police officers also repeated Dr. Bradbury's

instructions to Anderson. Thus, she understood that if Paugh manifested "red flags"

of alcohol withdrawal, meaning that if his "condition worsened . . . in any way," the

staff needed to get Paugh to the hospital. R. vol. 2 at 11 (citation omitted).

Bunnell placed Paugh in a detoxification cell to let him sleep. After that,

Bunnell and Anderson did not check on or interact with Paugh for the rest of their

---

[4] Bunnell knew about Paugh's chronic alcoholism from his time as a patrol officer and because the two men lived near each other in Vernal, Utah.

[5] The district court repeatedly found that Paugh's condition worsened during his time at the jail. *See, e.g.*, R. vol. 2 at 65 ("Anderson knew from the pass-along with Gowen that Paugh's condition had worsened during the day on July 24."). Accepting that as true, as we must on interlocutory appeal, we note Anderson and Bunnell's description of Paugh when he first arrived at the jail. *See Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) ("The district court's factual findings and reasonable assumptions comprise the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." (internal quotations and citation omitted)).

shift, even though the jail maintains a "head count" policy requiring its officials to "at least once each hour, and whenever possible, every 30 minutes," "individually observe inmates," R. vol. 2 at 29 (citation omitted).

**C.      Day Shift on July 24, 2015 (6:00 a.m. to 6:00 p.m.)**

At 6:00 a.m., the other Individual Defendants—Gowen, Conley, and Fuller—began their twelve-hour shift at the jail. Gowen was the shift supervisor, and Fuller was the designated medical official. Jail policy requires officials from an earlier shift to brief their replacements about pertinent information when changing shifts. So during this "pass-along," Anderson, Bunnell, and Riddle needed to inform Gowen, Conley, and Fuller about Paugh's alcohol-withdrawal condition, Paugh's unfilled Librium prescription, and Dr. Bradbury's discharge instructions. *Id.* at 12 (citation omitted). But the night shift failed to pass this information along to the day shift. Still, Gowen, Conley, and Fuller later "reviewed at least part of Paugh's medical file or otherwise learned that" Paugh was experiencing alcohol withdrawal. *Id.* at 13.

At about 6:30 a.m., Conley served Paugh breakfast, but Paugh did not eat it. Despite not eating, according to Conley, Paugh "seemed normal and well." *Id.* at 62 (citation omitted). At 11:00 a.m., Fuller served Paugh lunch. When doing so, Fuller noticed the shakiness of Paugh's hands, so he advised Paugh to "drink fluids and stay hydrated." *Id.* at 13. Around the same time, Gowen also noticed that Paugh's hands

6

were shaking, and he knew that Paugh had already "retched, or dry-heaved" "two or three times" within the last "two or three hours."[6] *Id.* at 14 (citation omitted).

At about 11:30 a.m., Fuller left the jail to fill Paugh's Librium prescription after Conley realized that no one else had done so. After Fuller left, Conley started Paugh's booking and screening processes. Gowen was present in the booking area as Paugh answered questions. While answering the jail's screening questions, Paugh had to go back to his cell to vomit.

After returning to the booking area, and in response to Conley's medical-screening questions, Paugh told Conley that he was "currently going through withdrawals," that he was in "lots of pain from three broken ribs," that he had medical problems related to seizures, that he was feeling "restlessness/anxiety," and that he suffered from alcoholism. *Id.* at 13 (citation omitted). Jail policy requires its officials to contact medical professionals if an inmate answers "yes" to "any medical screening question." *Id.* at 173. Despite this policy and Paugh's affirmative answers, neither Gowen nor Conley sought medical attention for him.

Fuller then returned to the jail with Paugh's Librium, which he says he gave to Paugh around 1:40 p.m. While giving Paugh his Librium, Fuller noticed that Paugh's hands shook the entire time.

After giving Paugh a dose of Librium, Fuller noticed a problem. The jail's general policy was to distribute medication three times a day at 7:00 a.m., 12:00 p.m.,

---

[6] The district court found a genuine dispute of material fact about how many times Paugh had vomited while at the jail.

7

and 5:00 p.m. But Paugh's Librium packaging specified that two Librium capsules needed to be given "every 2 hours as needed," R. vol. 4 at 138, and Dr. Bradbury's instructions called for Paugh to receive two capsules "as needed," R. vol. 3 at 190.

To resolve the discrepancy, Fuller called physician-assistant Logan Clark ("PA Clark").[7] PA Clark asked whether Fuller had seen "any symptoms of withdrawal," including "any shaking, any issues like that." R. vol. 2 at 75 (citation omitted). Fuller told PA Clark that he had seen no withdrawal symptoms, and he assured PA Clark that Paugh had been "walking around good," "ha[d] been eating," hadn't been throwing up, and "seem[ed] to be doing good." *Id.* (citation omitted). Fuller made these statements despite observing Paugh's shaking hands and knowing that Paugh had vomited earlier.[8]

Believing that Paugh was not suffering from alcohol-withdrawal symptoms, PA Clark instructed Fuller to lower Paugh's Librium dosage to one capsule three times a day to conform with the jail's standard protocol. PA Clark also told Fuller that he "expected to be notified if there was any change to Paugh's symptoms." *Id.* (cleaned up).

---

[7] The jail had a contract with PA Clark to provide remote medical assistance to its inmates.

[8] Fuller and PA Clark disagree "about the content of this phone conversation and the extent to which Fuller informed [PA] Clark about Paugh's condition and the nature of his Librium prescription." R. vol. 2 at 75. For our purposes, we recite the facts as the district court does. *See Crowson*, 983 F.3d at 1174 n.3.

At about 4:00 p.m., Gowen served Paugh dinner. During this encounter, Paugh told Gowen that he was "feeling sick and nauseous" and that "he had not [yet] hit [the] peak" of his alcohol-withdrawal symptoms. *Id.* at 15 (citation omitted). While speaking to him, Gowen observed that Paugh's hands and forearms were "visibly shaking." *Id*. (citation omitted). Gowen even noted that Paugh seemed "really sick from detoxing," given that he had vomited and "not eaten much throughout the day." *Id*. at 15–16 (citation omitted).

Around 5:00 p.m., Fuller began dispensing medication to the inmates. But before he reached Paugh, Fuller had to respond to an incident with another inmate. So Fuller had Conley take over the medication-distribution duties. For reasons still unclear, neither Conley nor anyone else on this shift gave Paugh his Librium. Nor did Fuller confirm with Conley that Paugh had properly received his Librium.

At 5:30 p.m., when Conley retrieved Paugh's dinner tray, he noticed that Paugh was "shaking pretty bad." *Id.* at 15 (citation omitted). Paugh repeated to Conley what he had told Gowen—that his withdrawal "had not peaked yet." *Id.* at 16 (cleaned up).

### D.    Night Shift on July 24, 2015 to July 25, 2015 (6:00 p.m. to 6:00 a.m.)

Anderson, Bunnell, Riddle, and Tony Alarid[9] were on duty for the night shift. Once again, Anderson was the shift supervisor, and Bunnell was the designated medical official.

---

[9] The Estate did not sue Alarid.

9

Fuller testified that he had a "brief pass-along" to Alarid. *Id.* at 76 (citation omitted). But Fuller did not "fully inform Alarid about Paugh's worsening condition." *Id.* Nor did he tell anyone else that PA Clark expected to be updated "if there was any change to Paugh's symptoms." *Id.*

Unlike Fuller, Gowen testified that he told Anderson about Paugh's withdrawal symptoms. In fact, Gowen allegedly instructed Anderson to "get up" and check on Paugh "as often as she [could]" to make sure he was "breathing and in no distress."[10] *Id.* at 16 (citation omitted).[11]

About an hour into this shift, Paugh told Bunnell and Anderson that he had not received any Librium during dinner. And because he was feeling sick from his withdrawal symptoms, he asked when he would be given his next round of medication. While speaking to Paugh, Anderson and Bunnell noticed that Paugh was shaking, looked pale, and didn't appear to be well.

Around 8:00 p.m., Bunnell allegedly gave Paugh a second dose of Librium. During this encounter, Paugh was still shaking and pale, and Paugh told Bunnell that "he was detoxing." *Id.* at 17 (citation omitted).

---

[10] Bunnell stated that no one updated him about Paugh's condition during the pass-along. But he also admitted that he did not ask for an update.

[11] Anderson does not recall Gowen communicating these expectations to her. She only remembers Gowen telling her that Paugh had started his Librium, that he had "slept a lot of the day," that "he had thrown up once" or "had been throwing up," and that he "had eaten some food." R. vol. 2 at 16 (citation omitted).

Between 9:45 and 10:00 p.m., Bunnell went to speak with Paugh again, who was still shaking. But this time, Paugh also told Bunnell that "he was getting the chills then hot again." *Id.* at 18 (citation omitted). Anderson then came over, and Paugh told her that he was nauseous. She observed that Paugh seemed "shaky," had the chills, and looked sick. R. vol. 2 at 18 (citation omitted).

At this time, Anderson and Bunnell decided to move Paugh to a different cell so that he could be in "a cell alone while he was sick." *Id.* at 18 (citation omitted). Bunnell also gave Paugh another blanket.

Sometime after moving Paugh, Anderson thought she heard Paugh vomit. And throughout that night, she heard him "coughing," "sneezing," and sounding like he was "trying to get phlegm out of his throat to spit." *Id.* (cleaned up). Bunnell recalled hearing the same thing.

At about 2:00 a.m., Bunnell felt ill and went home for the night. Before leaving, Bunnell peered into Paugh's cell but did not otherwise check on Paugh. Riddle took over Bunnell's duties. Neither Bunnell nor Anderson told Riddle that Paugh was withdrawing from alcohol. And Riddle didn't review Paugh's medical files. In fact, between 10:00 p.m. and 6:10 a.m., Anderson acknowledged that no jail officer "performed an actual physical check on Inmate Paugh." *Id.* at 19.

### E.    Paugh's Death: July 25, 2015

At about 6:10 a.m., when Conley visited Paugh to administer his Librium, he found Paugh dead. Because Paugh's lips were blue, Conley assumed that Paugh had probably been dead for a while.

11

From Paugh's autopsy, the medical examiner concluded that Paugh's death had "resulted from chronic alcoholism, most likely a complication of withdrawal." *Id.* at 20 (citation omitted). The examiner also found no Librium in Paugh's blood. This was notable because Librium has an "extremely long half-life of . . . (24–48 hours)." *Id.* at 23 (citation omitted). So the lack of Librium in Paugh's blood raised the question of whether Paugh had ever received *any* Librium at the jail.[12] One of Paugh's experts opined that had Paugh been provided Librium, "he would have most likely not died" and that if he had been "returned to the hospital for life-saving measure[s] as his condition continued to worsen, he would have most likely not died." *Id.* at 24 (citation omitted).

## II.    Procedural Background

Under § 1983, the personal representative[13] of Paugh's estate sued Uintah County and the Individual Defendants.[14] The Estate alleged that the Individual Defendants had violated Paugh's constitutional rights by being deliberately indifferent to his serious medical needs. It also alleged that their conduct resulted from the County's constitutionally deficient policies, customs, and training.

---

[12] Paugh's blood did show traces of Benadryl. This led one of Paugh's experts to hypothesize that Paugh had "erroneously" received Benadryl, instead of Librium. R. vol. 2 at 23 (citation omitted).

[13] Paugh's brother Robert Harlow resigned as the personal representative of his estate, so his sister Tristen Calder assumed that role. Paugh's parents also sued in their individual capacities, but the district court dismissed them for lack of standing.

[14] The Estate also sued Dr. Bradbury, ARMC, and PA Clark. But the parties later stipulated to the dismissal of these Defendants.

The County and the Individual Defendants moved for summary judgment, with the Individual Defendants asserting qualified immunity. The district court denied both motions. This interlocutory appeal followed.

## DISCUSSION

### I.    Individual Defendants

#### A.    Jurisdiction

An order denying summary judgment is "generally not a final decision within the meaning of [28 U.S.C.] § 1291 and is thus generally not immediately appealable." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). But under the collateral-order doctrine, "a circuit court may review certain orders as appealable final decisions within the meaning of [] § 1291 even though the district court has not entered a final judgment." *Henderson v. Glanz*, 813 F.3d 938, 947 (10th Cir. 2015) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

To establish jurisdiction under this doctrine, defendants must show that the district court's order "(1) conclusively determined the disputed question, (2) resolved an important issue completely separate from the merits of the case, and (3) is effectively unreviewable on appeal from a final judgment." *Gray v. Baker*, 399 F.3d 1241, 1245 (10th Cir. 2005) (citing *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989)). "The denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity easily meets these requirements." *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985).

13

When reviewing a denial of summary judgment based on qualified immunity, we generally lack jurisdiction to review factual disputes.[15] *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162 (10th Cir. 2021). Instead, "we must accept any facts that the district court assumed in denying summary judgment." *Amundsen v. Jones*, 533 F.3d 1192, 1196 (10th Cir. 2008).

Thus, the focus of our review on interlocutory appeal concerns only "abstract issues of law relating to qualified immunity." *Behren v. Pelletier*, 516 U.S. 299, 313 (1996) (cleaned up). This means "we can consider only '(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.'" *Finch v. Rapp*, 38 F.4th 1234, 1240–41 (10th Cir. 2022) (quoting *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

## B.     Qualified Immunity Standard of Review

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Est. of Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). In other words, it "protects all but the plainly incompetent or those who

---

[15] "There is an exception to this jurisdictional limitation 'when the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record.'" *Crowson*, 983 F.3d at 1177 (quoting *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010)).

knowingly violate the law." *Mullenix*, 577 U.S. at 12 (internal quotations omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006).

To overcome the defense of qualified immunity, the plaintiff must raise a genuine issue of material fact that "(1) the defendant's actions violated his or her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged misconduct." *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1261 (10th Cir. 2022). Failure at either step requires us to grant qualified immunity. *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018). We may address either step of the qualified-immunity analysis first. *Id.*

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Estate of Beauford*, 35 F.4th at 1261–62 (citation omitted). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be

'properly denied.'" *Id.* at 1262 (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002)).

### C.    Deliberate Indifference

"The right to custodial medical care is well settled." *Id.* "A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *see also Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."). Those same constitutional protections apply to pretrial detainees, such as Paugh, through the Fourteenth Amendment's Due Process Clause. *See Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) ("The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause.").

The Supreme Court has explained that "deliberate indifference entails something more than mere negligence." *Farmer*, 511 U.S. at 835. But "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Thus, the Court has equated deliberate indifference to "recklessness," in which "a person disregards a risk of harm of which he is aware." *Verdecia v. Adam*, 327 F.3d 1171, 1175 (10th Cir. 2003) (quoting *Farmer*, 511 U.S. at 836–37).

"Our cases recognize two types of conduct constituting deliberate indifference." *Sealock*, 218 F.3d at 1211. The first applies when medical

16

professionals "fail to treat a serious medical condition properly." *Id.* This may occur, for example, when a medical professional "fails to treat a medical condition so obvious that even a layman would recognize the condition," "completely denies care although presented with recognizable symptoms which potentially create a medical emergency," or "responds to an obvious risk with treatment that is patently unreasonable." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

But, at the same time, a medical professional has not acted with deliberate indifference if he or she merely negligently treats or diagnoses an inmate—even if that provided care would constitute medical malpractice. *See Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (explaining that a physician's negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment" because "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner").

But because none of the Individual Defendants were medical professionals, we instead focus on the second type of conduct—that of "gatekeepers." "[W]hen prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," they may be liable for deliberate indifference. *Sealock*, 218 F.3d at 1211. In other words, a jail official's delay or refusal to obtain medical care for an inmate may constitute deliberate

17

indifference. *See id.*; *see also Estelle*, 429 U.S. at 104–05 (explaining that deliberate indifference may be manifested "by prison guards in intentionally denying or delaying access to medical care").

Thus, using "the facts that the district court ruled a reasonable jury could find," *Crowson*, 983 F.3d at 1177, we must determine whether the Estate has raised a genuine issue of material fact that the Individual Defendants failed to fulfill their "gatekeeper" roles, *Sealock*, 218 F.3d at 1211.

### a.    Constitutional Violation

"The contours of constitutional liability under the deliberate-indifference standard are familiar: there is both an objective and a subjective component." *Estate of Beauford*, 35 F.4th at 1262. The objective component focuses on the "seriousness of the plaintiff's alleged harm," and the subjective component focuses on "the mental state of the defendant with respect to the risk of that harm." *Prince v. Sherriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022).

### i.    Objective Component

To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self*, 439 F.3d at 1230 (quoting *Farmer*, 511 U.S. at 834). Generally, a medical need qualifies as "sufficiently serious" if it "has been diagnosed by a physician as mandating treatment" or if it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (citation omitted).

But a plaintiff can also satisfy the objective component based on a "delay in medical care . . . if 'the delay resulted in substantial harm.'" *Estate of Beauford*, 35 F.4th at 1262 (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Mata*, 427 F.3d at 751). The "substantial harm" may be based on "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (citation omitted). Or it may be based on the inmate's "ultimate harm." *Mata*, 427 F.3d at 754 (explaining that an inmate's "ultimate harm, heart damage, would satisfy the objective component").

The plaintiff selects "what harm to claim." *Id.* at 753. Sometimes a plaintiff "may be better off claiming some intermediate harm rather than the last untoward event to befall her." *Id.* This is because the plaintiff "may not be able to prove that this last event was caused by any government actor or that the actor who caused the event acted with the requisite culpable state of mind." *Id.*

The Individual Defendants maintain that Paugh's alcohol-withdrawal condition was not objectively serious enough to satisfy this standard. *See* Opening Br. at 37 ("Plaintiff has not shown that alcohol withdrawal is an objectively serious medical need."). But assuming that is correct,[16] the Estate also argues that it has met the objective component with evidence that the Individual Defendants' delay in

---

[16] We do not decide whether alcohol withdrawal, *on its own*, is sufficiently serious to satisfy the objective component.

providing medical care caused Paugh's death. *See* Response Br. at 31 ("A delay in treatment that causes death is, without a doubt, sufficiently serious to meet the objective component of the constitutional analysis." (internal quotations and citation omitted)).

We agree that the Estate has satisfied the objective component. It has presented expert evidence that the Individual Defendants' failure to obtain medical care led to Paugh's death. *See* R. vol. 2 at 24 (expert report stating: "If [Paugh] was returned to the hospital for life-saving measure[s] as his condition continued to worsen, he would have most likely not died"). And we've consistently held that death qualifies as a "substantial harm" that satisfies the objective component. *Prince*, 28 F.4th at 1045 ("It is undisputed that [the prisoner's] ultimate harm of death was sufficiently serious for purposes of the objective component of deliberate indifference."); *see also Burke*, 935 F.3d at 994 ("An inmate's death meets [the objective component] requirement without a doubt." (internal quotations and citation omitted)); *Martinez v. Beggs*, 563 F.3d 1082, 1088–89 (10th Cir. 2009) ("We agree . . . that 'the ultimate harm to [the inmate], that is, his heart attack and death, was, without doubt, sufficiently serious to meet the objective component' necessary to implicate the Fourteenth Amendment." (brackets omitted)); *Est. of Booker v. Gomez*, 745 F.3d 405, 430–31 (10th Cir. 2014) (recognizing that death is sufficiently serious to meet the objective component); *Stella v. Anderson*, 844 F. App'x 53, 56 (10th Cir.

20

2021) ("Thus, the objective component is satisfied if the claim is that the prisoner died as a result of the prison official's conduct.").[17]

### ii.    Subjective Component

The subjective component "requires the plaintiff to present evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. That is, a plaintiff must present a triable issue of fact that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Strain v. Regalado*, 977 F.3d 984, 990 (10th Cir. 2020). For this, the plaintiff must establish that a defendant was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the defendant actually drew the inference. *Id.*

A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate." *Farmer*, 511 U.S. at 842. Rather, it is enough that an official "merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n.8. "Whether a prison official had the requisite

---

[17] The Individual Defendants argue that the objective component cannot be met based on "the ultimate harm." Opening Br. at 29. As support, they point out that in *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022 (10th Cir. 2020), where an inmate died, we did not conclude that death satisfied the objective component. *See id.* at 1029. Instead, we assumed, without deciding, that the "*severe* opioid withdrawal [the inmate] experienced *does* satisfy" the objective component. *Id.* (emphasis in original). But, as explained, the plaintiff selects "what harm to claim." *Mata*, 427 F.3d at 753. Thus, the plaintiffs in *Quintana* were free to argue that heroin withdrawal, rather than death, satisfied the objective component.

knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.

### 1.   Obviousness of Paugh's Medical Needs

We have explained that a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Quintana*, 973 F.3d at 1029 (quoting *Farmer*, 511 U.S. at 842). But this requires "that such risks present themselves as 'obvious' to the so-called 'reasonable man.'" *Id.* (citation omitted).

In *Quintana*, we noted that, under our precedent, unconsciousness, "a gangrenous hand[,] or a serious laceration" qualify as "obvious" signs of medical distress. *Id.* (citing *Garcia v. Salt Lake Ctny.*, 768 F.2d 303, 308 (10th Cir. 1985) and *Self*, 439 F.3d at 1232). But we explained that "characteristics common to many intoxicated individuals do not present an obvious risk." *Id.* (cleaned up).

With that in mind, we held that the symptom of "frequent vomiting alone does not present an obvious risk of severe and dangerous withdrawal." *Id.* (citing *Martinez*, 563 F.3d at 1091). But a symptom like "*bloody* vomiting," we reasoned, does present an obvious risk because it would reasonably imply "an actual internal injury" and make "the presence of a serious medical need more plausible and more obvious." *Id.* at 1030.

Relying on *Quintana*, the Individual Defendants argue that Paugh did not display obvious signs of a medical need, because his symptoms were "common to many intoxicated individuals." Opening Br. at 29 (quoting *Quintana*, 973 F.3d at 1029). And because Paugh lacked obvious symptoms—like bloody vomit—the

Individual Defendants maintain that nothing could have alerted them that he was at an obvious risk of harm. *See id.*

But this argument fails to account for one key fact—Dr. Bradbury's discharge instructions. So we must decide whether Paugh's observable symptoms—in light of those instructions—constituted such an obvious need for medical treatment that a reasonable jury could infer deliberate indifference in failing to follow those instructions.[18]

Our decision in *Spark v. Singh*, 690 F. App'x 598 (10th Cir. 2017), is instructive. There, an inmate sued a physician assistant for failing to diagnose and treat his diabetes. *Id.* at 600. To support his claim, the inmate cited an infirmary note "which reported a questionable history of diabetes." *Id.* at 606. The inmate argued that the physician assistant had been "deliberately indifferent in failing to treat him for diabetes despite having reviewed these records." *Id.*

In addressing the inmate's claim, we considered whether the infirmary note "presented an obvious need for treatment." *Id.* at 607. We held that the "infirmary note's cursory reference to a questionable history of diabetes was" insufficient to "signal a need for treatment so obvious that even a layperson would recognize it." *Id.*

---

[18] We also note that in *Quintana*, we held that "frequent vomiting *alone* does not present an obvious risk of severe and dangerous withdrawal." 973 F.3d at 1029 (emphasis added). But here, there was more. The district court also found that "Paugh either reported or was observed experiencing tremors, paleness . . . , spitting up mucus, cold chills and other fever symptoms, loss of appetite, restlessness and anxiety, and significant shaking in his hands to the point that it extended through his forearms and the shaking could be seen from a distance." R. vol. 2 at 58.

at 608. This was so, we explained, because the infirmary note was neither "a confirmed diagnosis requiring treatment," nor "a clear directive for treatment." *Id.*

Likewise, in *Clark v. Colbert*, 895 F.3d 1258 (10th Cir. 2018), a plaintiff argued that a nurse practitioner had acted with deliberate indifference by failing to follow a hospital's discharge instructions. *Id.* at 1269. We rejected this argument because the discharge instructions had merely directed the plaintiff to follow up with the surgeon who had previously operated on him. *Id.* "The instruction to follow up with the surgeon," we explained, "[did] not amount to a diagnosis of a particular condition or a prescription of specific care." *Id.* Thus, "the need for additional treatment" was not obvious. *Id.* (citation omitted).

Here, unlike the instructions in *Clark*, Dr. Bradbury's instructions did more than direct Paugh to schedule a follow-up appointment. In fact, they diagnosed more than one "particular condition"—alcohol withdrawal and alcoholism. *Clark*, 895 F.3d at 1269. Dr. Bradbury's instructions also "manifest[ed] a clear directive for treatment," *Spark*, 690 F. App'x at 608, and a "prescription of specific care," *Clark*, 895 F.3d at 1269—give Paugh Librium "as needed" and return him to the hospital if his symptoms worsened.[19] In other words, Dr. Bradbury's instructions were

_____

[19] Indeed, a pamphlet attached to Dr. Bradbury's instructions even warned the Individual Defendants to look out for symptoms that would require "immediate medical care," such as, among other things, a fever, uncontrolled vomiting, agitation, or confusion. R. vol. 3 at 193 (capitalization). These are the same symptoms that the district court concluded that a reasonable jury could find that Paugh had exhibited. *See* R. vol. 2 at 58, 58 n.17 (finding that Paugh had "vomited multiple times" while at the jail, that he was restless and anxious, and that he had "cold chills and other fever symptoms").

24

everything the infirmary note in *Spark* and the follow-up instructions in *Clark* were not. Thus, Dr. Bradbury's discharge instructions did indeed "signal a need for treatment so obvious that even a layperson would recognize it." *Spark*, 690 F. App'x at 608.

In sum, given Dr. Bradbury's instructions, a reasonable jury could find that it would have been "obvious" to any reasonable jail official that Paugh needed medical assistance if the Individual Defendants saw Paugh's condition worsening. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002) ("[I]f a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction."), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).

### 2.  Knowledge of Paugh's Worsening Condition and Disregard of Paugh's Obvious Medical Need

We now consider two questions. First, we ask whether a reasonable jury could find that the Individual Defendants saw Paugh's condition worsen, signaling his obvious need for medical attention based on Dr. Bradbury's discharge instructions. Second, we ask whether a reasonable jury could find that the Individual Defendants disregarded Paugh's obvious medical needs. As we will explain below, the answer to both questions is yes.

But before diving into the specific facts of this case, we review the type of evidence needed to show deliberate indifference in the face of a serious medical

25

need. In *Mata*, for example, an inmate sought medical attention for "severe chest pain." 427 F.3d at 755. Despite the inmate's pleas for medical attention, a nurse refused to administer first aid or summon medical assistance. *Id.* We held that the nurse had failed to fulfill her gatekeeping duties when she "completely refused to assess or diagnose [the inmate's] medical condition at all." *Id.* at 758.

Likewise, in *Burke*, an inmate claimed to be paralyzed. 935 F.3d at 982. We held that a reasonable jury could find that two jail officials "were deliberately indifferent to the serious risk that [the inmate] was suffering from a medical issue that demanded attention." *Id.* at 994. This was so, we explained, because the jail officials "made no attempt to determine the severity of [the inmate's] medical need or the safety risk he might have posed," and had "abdicated their gatekeeping roles by failing to relay the problem to medical staff." *Id.*

And in *Quintana*, an inmate died due to complications from heroin withdrawal. 973 F.3d at 1027. His estate sued, and we held that the estate had adequately alleged a constitutional violation against one of the jail officials who "did not attempt to provide any . . . medical assistance" to the inmate. *Id.* We reasoned that because the inmate had told the jail official that he was "withdrawing from heroin and was throwing up blood," the jail official's inaction in the face of this "serious medical need" amounted to deliberate indifference. *Id.* at 1030 (internal quotations omitted).

In contrast, we have affirmed the grant of qualified immunity to jail officials who had no reason to suspect that an inmate was in serious need of medical attention. In *Boyett v. Cnty. of Washington*, 282 F. App'x 667 (10th Cir. 2008), for example, an

26

inmate's estate argued that jail officials had been deliberately indifferent by failing to prevent the inmate's death. *Id.* at 678. We rejected this claim because the inmate had died of a coronary artery disease, and there was no evidence of "the disease on [the inmate's] medical history paperwork, nor had he shown any symptoms of the disease before he died." *Id.* Thus, we held that there was "no reason to believe any prison official should have been aware of this medical risk." *Id.*; *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 797–98 (6th Cir. 2005) (affirming grant of qualified immunity to jail officials who "had no prior notice of [an inmate's] insulin dependence or of her deteriorating condition" but reversing grant of qualified immunity to jail officials who had known that the inmate "required insulin for her condition and that she was past due for her current dose").

In short, these cases illustrate that when a jail official knows, or "refuse[s] to verify underlying facts that he strongly suspected to be true, or decline[s] to confirm inferences of risk that he strongly suspected to exist" about an inmate's serious medical need, the official's failure to obtain medical assistance constitutes deliberate indifference. *Farmer*, 511 U.S. at 843 n.8; *see Burke*, 935 F.3d at 993 ("We have found deliberate indifference when jail officials confronted with serious symptoms took no action to treat them."); *see also Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008) ("If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may [be] held liable for deliberate indifference."). We turn now to the specific facts of this case.

27

### a. *Anderson*

The district court found that the Estate had submitted sufficient evidence to allow a reasonable jury to conclude that Anderson had violated Paugh's constitutional rights. R. vol. 2 at 66 ("[A] reasonable jury could find that Anderson 'completely refused to assess or diagnose [Paugh's] medical condition at all by' ignoring his serious medical problems[.]" (quoting *Mata*, 427 F.3d at 758)).

We agree. First, a jury could find that Anderson had seen Paugh's condition worsen. When Paugh first arrived at the jail, Anderson attested that he seemed "just fine." R. vol. 3 at 85. Yet at her next shift, she learned about Paugh's alcohol-withdrawal symptoms from Gowen, including that he had vomited "throughout the day," that he was "feeling sick and nauseous," and that he seemed "really sick from detoxing." R. vol. 2 at 15–16 (citation omitted). A regression from "just fine" to exhibiting these symptoms qualifies as worsening of Paugh's condition.

Anderson also personally observed Paugh's symptoms throughout the remainder of her shift. Between 7:00 and 8:00 p.m., Anderson saw Paugh shaking. Then, at 9:45 p.m., in addition to his shaking, Paugh told Anderson that he "was nauseous," was feeling sick, and "had cold chills." *Id.* at 66 (citation omitted). At minimum, these added symptoms—which Anderson had not previously seen—raise a triable issue of material fact about whether Anderson knew Paugh's condition was worsening.

Second, based on the worsening of Paugh's condition, a reasonable jury could find that Paugh's need for medical assistance was obvious. In *Boyett*, we held that

there was no evidence that the jail officials had acted with deliberate indifference in failing to prevent an inmate's death. 282 F. App'x at 678. This was because the jail officials had been unaware that the inmate was suffering from coronary disease, there was no mention of the disease in his "medical history paperwork," and the inmate displayed no "symptoms of the disease before he died." *Id.* But here, Anderson knew about Paugh's alcohol-withdrawal condition, Paugh's file stated that he was suffering from alcohol withdrawal, and he displayed symptoms consistent with that condition.

And given Dr. Bradbury's discharge instructions, Paugh's need for medical assistance was arguably more obvious than in *Quintana*. Recall, in *Quintana*, the obviousness of the inmate's need for medical attention stemmed from *a particular* symptom—the presence of blood in his vomit, which would have likely signaled "an actual internal injury." 973 F.3d at 1030. But here, the need for medical assistance was apparent from the face of Dr. Bradbury's discharge instructions, which even warned Anderson of the symptoms to look for. And Paugh exhibited many of those symptoms, including agitation, fever-like symptoms, and anxiety. *See* R. vol. 2 at 58 (finding that "Paugh either reported or was observed experiencing . . . cold chills and other fever symptoms, loss of appetite, restlessness and anxiety"); *see also Williams v. City of Yazoo*, 41 F.4th 416, 424 (5th Cir. 2022) (explaining that a plaintiff's deliberate-indifference claim was "not a close case" given the inmate's "diagnosis, symptoms, and requests for help").

Finally, a reasonable jury could find that Anderson abdicated her gatekeeping duties by failing to obtain medical assistance for Paugh. Anderson understood that if

29

Paugh exhibited "red flags" of alcohol withdrawal, meaning that if his "condition worsened . . . in *any way*," she would have to return him to the hospital. R. vol. 2 at 11 (emphasis added) (citation omitted). Thus, based on Paugh's worsening condition and Dr. Bradbury's discharge instructions, Anderson should have—at a minimum—contacted a medical professional about Paugh's condition. Yet her inaction mirrors that of the jail officials in *Burke* who "made no attempt to determine the severity of [an inmate's] medical need." 935 F.3d at 994. As a result, Anderson, like those jail officials, "abdicated [her] gatekeeping role[] by failing to relay the problem to medical staff." *Id.*

In sum, we agree with the district court that a reasonable jury could find that Anderson: (1) was aware that Paugh was "in obvious need for medical attention," and (2) abdicated her gatekeeping role by not "relay[ing] the problem to medical staff." *Id.* at 995. So we agree with the district court that Anderson is not entitled to qualified immunity.

### b. *Bunnell*

The district court ruled that the Estate had raised a triable issue of material fact that Bunnell knew of and disregarded a significant risk to Paugh's health. R. vol. 2 at 71 ("[A] reasonable jury could find that Bunnell's conduct amounts to deliberate indifference because he was 'confronted with serious symptoms' . . . but 'took no action to treat them.'") (quoting *Burke*, 935 F.3d at 993)). We agree.

Like Anderson, a reasonable jury could find that Bunnell saw Paugh's condition worsen. For example, when Paugh first arrived at the jail on July 24, 2015,

30

Bunnell said that "[h]e was walking, talking," and "[d]idn't seem unsteady on his feet." R. vol. 3 at 135. But an hour into his next shift on July 25, 2015, Bunnell saw Paugh shaking, looking "pale," and seeming unwell. R. vol. 2 at 68 (citation omitted). In fact, Paugh confirmed to Bunnell that "he was feeling sick from withdrawal." *Id.* Then, around 9:45 or 10:00 p.m., Paugh told Bunnell "he was getting the chills then hot again"—symptoms that Bunnell had not previously observed in Paugh. *Id.* at 69 (citation omitted). The Estate has thus raised a triable issue of fact that Bunnell had seen Paugh's condition worsen.

Based on Paugh's worsening condition and Dr. Bradbury's discharge instructions,[20] a jury could reasonably infer that Paugh was in obvious need of medical attention. *Cf. Boyett*, 282 F. App'x at 678 (rejecting deliberate-indifference claim because there was "no reason to believe any prison official should have been aware of this medical risk"). Despite that obvious need, Bunnell did not return Paugh to the hospital, declined to monitor Paugh during his shift, and failed to even contact a medical professional about Paugh's worsening condition. Indeed, Bunnell candidly admitted to disregarding Paugh's health risk, stating: "of all the thousands of drunks that we deal with, they all have hangovers and they all get better." R. vol. 2 at 70 (citation omitted). In short, as the district court aptly put it, when "confronted with

---

[20] The district court found that Bunnell understood "from the discharge paperwork that Paugh must be transported to the hospital if he experienced any worsening of his condition." R. vol. 2 at 70 (cleaned up).

serious symptoms," Bunnell "took no action to treat them." *See Burke*, 935 F.3d at 993.

Thus, the Estate has raised a triable issue of material fact that Bunnell acted with deliberate indifference towards Paugh's serious medical needs. So the district court properly denied Bunnell qualified immunity.[21]

### c. *Conley*

The district court also held that a reasonable jury could find that Conley was deliberately indifferent to Paugh's serious medical needs. R. vol. 2 at 73 ("[A] reasonable jury could find that Conley was deliberately indifferent[.]"). Once again, we agree.

Though Conley interacted with Paugh at different times than Anderson and Bunnell, there is still sufficient evidence that Conley observed Paugh's deteriorating condition. On July 24, 2015, at 6:30 a.m., when Conley first saw Paugh, he thought Paugh "seemed well and normal." *Id.* at 71 (citation omitted). But at 11:30 a.m., Conley saw Paugh "run back" to his cell to vomit while answering the jail's booking and screening questions. *Id.* Then by 5:30 p.m., Conley noticed that Paugh was "shaking pretty bad." *Id.* at 72 (citation omitted). Indeed, at that time, Paugh even told Conley that his withdrawal "had not peaked yet," indicating that his symptoms

---

[21] The district court found "a fact dispute concerning whether Bunnell gave Paugh Librium." R. vol. 2 at 70. We thus accept as true that Paugh did not receive any Librium from Bunnell. *See Lewis*, 604 F.3d at 1225 (explaining that on interlocutory appeal "if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true").

would get worse. *Id.* (brackets and citation omitted). On these facts, the Estate has raised a material dispute about whether Conley had seen Paugh's condition worsen from morning to night.

Because Conley understood Dr. Bradbury's discharge instructions[22] and observed Paugh's worsening condition, a reasonable jury could also conclude that Paugh's need for medical attention was obvious. *Cf. Boyett*, 282 F. App'x at 678 (rejecting deliberate-indifference claim because there was "no reason to believe any prison official should have been aware of this medical risk"). Yet Conley's "absolute failure to . . . attempt to assist [Paugh] in any fashion" in the face of this obvious need, evinces Conley's deliberate indifference. *See Mata*, 427 F.3d at 758. Indeed, Conley's refusal to obtain medical assistance for Paugh despite seeing his withdrawal symptoms is similar to the jail official in *Quintana* who "did not attempt to provide any . . . medical assistance," 973 F.3d at 1027, to the inmate he knew was withdrawing from heroin and was throwing up blood, *id.* at 1030.

The district court also found that Conley's failure to follow jail protocol and contact a medical professional following Paugh's affirmative answers to the screening questionnaire was further evidence of deliberate indifference. R. vol. 2 at 73 ("[A] reasonable jury could find that Conley was deliberately indifferent because of his 'absolute failure' to . . . [obtain] medical follow up on Paugh's

---

[22] The district court found that Conley understood from Dr. Bradbury's instructions that Paugh "should come back to the hospital" if his condition worsened. R. vol. 2 at 72 (citation omitted).

affirmative answers to the screening questionnaire." (quoting *Mata*, 427 F.3d at 758)).

We agree. We acknowledge that "[f]ailing to comply with jail policy does not amount to a constitutional violation on its own." *George v. Beaver Cnty.*, 32 F.4th 1246, 1254 (10th Cir. 2022). But, at the same time, it "certainly provide[s] circumstantial evidence that a . . . gatekeeper knew of a substantial risk of serious harm." *Prince*, 28 F.4th at 1046 (citation omitted).

In *Phillips v. Roane Cnty.*, 534 F.3d 531 (6th Cir. 2008), for example, the Sixth Circuit held that a genuine issue of fact existed as to whether a jail's correctional officers had acted with deliberate indifference in failing to render care to an inmate. *Id.* at 541. In coming to this conclusion, the Sixth Circuit found "persuasive" the officers' "disregard of prison protocols," which required the officers to transport the inmate to a hospital for diagnosis when she complained of chest pains. *Id.* The correctional officers' failure to do so despite the inmate's complaint of chest pains, the Sixth Circuit explained, was sufficient "to demonstrate the subjective component of deliberate indifference." *Id.*; *see also Mata*, 427 F.3d 757 (recognizing that violations of internal prison procedures "certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm").

Here, in response to the booking and screening questions, Paugh told Conley that he was "currently going through withdrawals," that he was in "lots of pain from three broken ribs," that he had medical problems related to seizures, that he was

34

feeling "restlessness/anxiety," and that he suffered from alcoholism. R. vol. 2 at 13. Jail policy required Conley to call a medical professional if an inmate answered affirmatively to any of these questions. Yet Conley failed to contact anyone. Conley's failure is especially egregious in light of his knowledge of Paugh's condition and Dr. Bradbury's discharge instructions. So like the correctional officers' failure to follow protocol and transport the inmate to a hospital in *Phillips*, Conley's failure to follow jail policy and contact medical professionals based on Paugh's affirmative answers to screening questions is "persuasive" evidence of deliberate indifference. 534 F.3d at 541.

Finally, the district court concluded that a reasonable jury could infer deliberate indifference from Conley's failure to give Paugh his Librium. Recall, Fuller had instructed Conley to give Paugh his Librium when Fuller had to attend to another inmate. Despite this instruction, it's undisputed that "Conley never gave Paugh his Librium during this shift." R. vol. 2 at 72.

"Failure to act in accordance with or intentional interference with *prescribed* medical treatment or instructions can give rise to an Eighth Amendment claim." *Ajaj v. United States*, 293 F. App'x 575, 579 (10th Cir. 2008) (emphasis in original); *see also Johnson v. Schwarzenegger*, 366 F. App'x 767, 770 (9th Cir. 2010) ("Failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need."). Thus, we agree with the district court that, on these facts, Conley's failure to give Paugh his Librium—when he knew about Paugh's need for it—raises a triable issue of fact about Conley's deliberate

35

indifference. *See Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) ("[A]llegations that a prison official has ignored the instructions of a prisoner's treating physician are sufficient to state a claim for deliberate indifference.").

In sum, we agree with the district court that "a reasonable jury could find that Conley was deliberately indifferent because of his 'absolute failure' to (a) 'follow the required protocols' concerning . . . medical follow up[s] on Paugh's affirmative answers to the screening questionnaire; (b) 'contact the appropriate medical personnel' when he observed Paugh's condition worsening from morning to night; or (c) 'attempt to assist [Paugh] in any fashion' during his shift." R. vol. 2 at 73 (quoting *Mata*, 427 F.3d at 758). Thus, the district court properly denied qualified immunity to Conley.

### d. *Gowen*

Next, the district court held that a reasonable jury could also "find that Gowen had acted with deliberate indifference." *Id.* at 79. Once again, we agree.

Like the other Individual Defendants, there is evidence that Gowen saw Paugh's condition worsen during his shift. For example, on July 24, 2015, by 12:00 p.m., Gowen had already heard Paugh "retch[]" "two or three times" in the span of "two or three hours." *Id.* at 78 (citation omitted). And when speaking to Paugh, Gowen could see that Paugh's "hands and . . . forearms were shaking." *Id.*

Then around 4:00 p.m., when serving dinner, in addition to seeing Paugh "visibly shaking," Paugh told Gowen that he was "feeling sick and nauseous" and that "he had not hit his peak yet" for his alcohol-withdrawal symptoms. *Id.* (citation

36

omitted). Indeed, Gowen even admitted that Paugh seemed "really sick from detoxing while at . . . the jail," such that he felt the need to "instruct[] Anderson to monitor Paugh's symptoms." *Id.* (citation omitted). A jury could reasonably view Paugh's condition as worsening, making Paugh's need for medical attention obvious under Dr. Bradbury's discharge instructions.[23]

Gowen's failure to obtain any medical assistance in the face of Paugh's obvious need raises a material dispute about Gowen's deliberate indifference. *See Mata*, 427 F.3d at 758 (holding that a nurse had failed to fulfill her gatekeeping duties when she "completely refused to assess or diagnose [the inmate's] medical condition at all"); *Burke* 935 F.3d at 994 (concluding that two jail officials were deliberately indifferent because they had "abdicated their gatekeeping roles by failing to relay the problem to medical staff"); *Quintana*, 973 F.3d at 1027, 1030 (holding that a jail official who "did not attempt to provide any . . . medical assistance" to an inmate's obvious medical needs amounted to a constitutional violation).

We also note that Gowen was sitting near Conley when Paugh was answering his booking and screening questions. Thus, drawing inferences for the Estate, the district court found that Gowen "knew of Paugh's affirmative answers to the medical screening questionnaire." R. vol. 2 at 77–78. So like Conley, Gowen's failure to follow jail protocol and contact a medical professional following Paugh's affirmative

---

[23] Gowen had "affirmed that he understood Dr. Bradbury's discharge instructions to mean that Paugh needed to return to the hospital if there was 'worsening of his condition.'" R. vol. 2 at 78 (citation omitted).

answers is further evidence of his deliberate indifference. *See Prince*, 28 F.4th at 1046 (noting that "violations of internal prison procedures 'certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm'" (citation omitted)).

In sum, the Estate has raised triable issues of material fact about Gowen's deliberate indifference based on his failure to obtain medical assistance for Paugh. As a result, the court properly found that Gowen is not entitled to qualified immunity.

### e.   *Fuller*

The district court also ruled that a reasonable jury could find that Fuller was deliberately indifferent to Paugh's serious medical needs. But unlike the other Individual Defendants, the court did not base its ruling on Fuller's observations of Paugh's worsening condition and Dr. Bradbury's discharge instructions.[24] Instead, the district court focused its analysis on Fuller's failure to accurately report Paugh's symptoms to PA Clark. *See* R. vol. 2 at 76 ("[A] reasonable jury could conclude that Fuller's failure to fully or accurately inform [PA] Clark of Paugh's condition and about his prescription was deliberately indifferent.").

---

[24] This may be because the record suggests that Fuller did not review Dr. Bradbury's discharge instruction to return Paugh to the hospital if his condition worsened. *See* R. vol 3 at 176 (Fuller uncertainly stating that he doesn't "believe [he] ever read through the discharge instructions"). But we do not review this factual dispute because we lack jurisdiction to do so. *See Crowson*, 983 F.3d at 1177 ("Generally, we lack jurisdiction to review factual disputes in this interlocutory posture."). Instead, we focus only on whether the district court's analysis of Fuller's actions amounts to a constitutional violation.

We agree that Fuller's failure to accurately convey Paugh's symptoms to PA Clark may be evidence of deliberate indifference. The Sixth Circuit's decision in *Winkler v. Madison Cnty.*, 893 F.3d 877 (6th Cir. 2018) is instructive here. There, after an inmate died while being held in jail, his estate's representative sued the jail and its officials. *Id.* at 885. The plaintiff alleged that one of the jail officials had been deliberately indifferent by allegedly withholding information from the jail's doctor during a call about the inmate. *Id.* at 895.

The Sixth Circuit found no constitutional violation, highlighting that there was nothing "in the record to support a finding that [the jail official] withheld information from [the jail's doctor]." *Id.* at 896. Instead, the Sixth Circuit determined that the jail official "responded immediately to [the inmate's] complaints and took reasonable action" by "promptly" calling the jail's doctor and reporting "what he knew about [the inmate's] symptoms." *Id.* at 895. This included telling the doctor that the inmate "was 'sick to his stomach,' 'could not keep anything down,' and was 'dope sick.'" *Id.*

The actions of *Winkler*'s jail official stand in stark contrast to those of Fuller's. Unlike in *Winkler*, in which there was no evidence that the jail official withheld information from the jail's doctor, there is evidence here that Fuller did exactly that when speaking with PA Clark. For example, PA Clark asked Fuller if he had seen Paugh exhibiting any withdrawal symptoms, including "any shaking, any issues like that." R. vol. 2 at 75 (citation omitted). Despite knowing that Paugh had been shaking, nauseous, and "throwing up only a few hours earlier," Fuller told PA Clark that Paugh was "walking around good," had been eating, and had not "been throwing

39

up." R. vol. 2 at 75 (citation omitted). The jail official in *Winkler*, on the other hand, reported "what he knew about [the inmate's] symptoms," including that the inmate "was 'sick to his stomach,' 'could not keep anything down,' and was 'dope sick.'" 893 F.3d at 895. In short, a reasonable jury could find that Fuller failed to fulfill his gatekeeping role by not "communicating [Paugh's] symptoms to a higher-up."[25] *Burke*, 935 F.3d at 993.

Thus, we agree with the district court that Fuller is not entitled to qualified immunity.

### iii.    *Individual Defendants' Counterarguments*

Still, the Individual Defendants argue that they could not have been deliberately indifferent for two reasons. First, they contend that Paugh exhibited only "mild" symptoms of withdrawal, so they were not indifferent to his *serious* medical needs. Second, the Individual Defendants insist that because they provided Paugh with some help, they could not have been deliberately indifferent under *Strain*. We address each argument in turn.

### 1.  Paugh's "Mild" Symptoms

Relying on the informational pamphlet attached to Dr. Bradbury's discharge instructions, the Individual Defendants argue that Paugh was suffering only "mild"

---

[25] In addition, the district court found a material dispute "concerning whether Fuller gave Paugh Librium." R. vol. 2 at 77. We thus assume that Fuller did not give Paugh any Librium. *See Lewis*, 604 F.3d at 1225 (explaining that on interlocutory appeal "if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true").

withdrawal symptoms. *See* Opening Br. at 30. The pamphlet describes "mild"

symptoms as "tremors in the hands"; "stomach upset"; "increases in heart rate,

breathing, and temperature"; and "anxiety, panic attacks, and bad dreams." R. vol. 3

at 193. As the Individual Defendants see it, "Paugh only had occasional vomiting

(upset stomach) and some hand tremors." Opening Br. at 30. Thus, according to the

Individual Defendants, because this pamphlet defined Paugh's symptoms as only

mild, they could not have been indifferent to his *serious* medical needs. *See id.* at 43.

　　We disagree. First, the Individual Defendants misconstrue the evidence. Paugh

did not "only" experience an upset stomach and hand tremors. Opening Br. at 30.

Paugh had many other symptoms such as vomiting multiple times, uncontrollable

shaking, anxiety, restlessness, and "cold chills and other fever symptoms." *See*

R. vol. 2 at 58. Second, if anything, the informational pamphlet on which the

Individual Defendants rely cuts against them. That pamphlet states that individuals

should seek "immediate medical care if" they experience symptoms such as a fever,

uncontrolled vomiting, uncontrolled anxiety, or agitation and confusion—symptoms

that Paugh was arguably exhibiting. R. vol. 3 at 193 (capitalization removed).

　　In any event, the informational pamphlet was merely a document *attached* to

Dr. Bradbury's discharge instructions. And though this document lists at least one of

Paugh's symptoms—hand tremors—as a potentially "mild" indicator of withdrawal,

*id.* at 193, this does not negate Dr. Bradbury's *actual* instruction—to return Paugh to

the hospital if there was "worsening of [Paugh's] condition," *id.* at 190. Dr.

Bradbury's instructions should have alerted the Individual Defendants to get Paugh

medical attention as soon as Paugh started turning for the worse—even if the start of his deteriorating condition began with a symptom that could be described as "mild" in less serious situations.

### 2. *Strain* Does Not Support the Individual Defendants

Next, the Individual Defendants argue that our decision in *Strain* bars a finding of deliberate indifference. Opening Br. at 32–33. In that case, an inmate "exhibited alcohol withdrawal symptoms while in county jail." *Strain*, 977 F.3d at 987. Though the jail's "[h]ealthcare providers diagnosed and treated [the inmate's] symptoms," the "treatment proved ineffective" and the inmate was left permanently disabled. *Id.* at 987–88.

The inmate's estate sued the jail and the medical professionals who had treated the inmate, alleging that they had been deliberately indifferent to his serious medical needs. *Id.* at 988. We held that the medical professionals were entitled to qualified immunity. *Id.* at 997. Likening this case to *Strain*, the Individual Defendants argue that they should also be entitled to qualified immunity because they "took similar actions to what the *Strain* defendants did." Opening Br. at 40. This argument fails for two reasons.

First, the defendants in *Strain* were all medical professionals, not lay officials like here. *See* 977 F.3d at 988 (describing the individual defendants as a nurse, a licensed professional counselor, and a doctor). And, as stated above, "[w]e distinguish a medical professional's negligent failure to treat a serious medical condition properly, which does not constitute deliberate indifference, from 'prison

42

officials who prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment,' which may constitute deliberate indifference." *Burke*, 935 F.3d at 992 (brackets omitted) (quoting *Sealock*, 218 F.3d at 1211). Indeed, that is why *Strain*'s deliberate-indifference analysis focused on whether the defendants' treatment of the inmate amounted to more than negligence, and not whether they delayed or refused to obtain medical assistance for the inmate. *See* 977 F.3d at 996–97 ("Although Plaintiff's claims may smack of negligence, we conclude that they fail to rise to the high level of deliberate indifference against any Defendant."). Thus, *Strain* is inapposite.

Second, even if we disregarded that fact, the care that the Individual Defendants allegedly offered to Paugh—"monitoring Paugh and giving him medication"—falls far short of what was provided in *Strain*. Opening Br. at 40. There, we held that the inmate's estate had not plausibly alleged deliberate indifference because the medical professionals tried to treat the inmate by "providing several physical and mental health assessments [], plac[ing] him on two forms of medication, and [keeping] him under routine observation." 977 F.3d at 995.

The Individual Defendants did none of those things for Paugh. At no point did they perform any physical assessment on Paugh. Nor did they keep him "under routine observation." *Id.* Indeed, the district court found that the Individual Defendants repeatedly failed to observe or monitor Paugh.[26] Finally, though the

---

[26] *See* R. vol. 2 at 66 (pointing out that Anderson "failed to check on Paugh from about 9:45 p.m. to when she ended her shift at 6:00 a.m."); *id.* at 69 ("Bunnell

Individual Defendants maintain that they gave Paugh Librium, even this material fact is in dispute, given that no Librium was found in his blood. As a result, *Strain* is inapplicable.

At bottom, a reasonable jury could find that the Individual Defendants knew, based on Dr. Bradbury's discharge instructions, that Paugh was at a serious risk of harm when they saw his condition worsen. And a reasonable jury could also find that the Individual Defendants disregarded that risk by failing to return Paugh to the hospital, as those instructions mandated, or at the very least contact a medical professional. The Estate has therefore raised a triable issue of material fact that the Individual Defendants violated Paugh's constitutional rights, satisfying the first prong of the qualified-immunity analysis.

### b.     Clearly Established Law

Next, we must decide whether Paugh's rights were clearly established at the time of the alleged constitutional violation. The law is clearly established when there is an "on point" Supreme Court or Tenth Circuit decision, "or the clearly established weight of authority from other courts have found the law to be as the plaintiff maintains." *Crowson*, 983 F.3d at 1178 (quoting *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018)). We must be careful not to define clearly established law "at a

---

again did not check on Paugh during the rest of his shift[.]"); *id.* at 72 ("Conley did not check on Paugh from when he finished the screening questionnaire to around 5:30 p.m." (brackets omitted)); *id.* at 76 ("Fuller did not check on Paugh in his cell from when he provided Paugh medication around 1:30 p.m. until the end of his shift."); *id.* at 78 ("But Gowen did not speak to or monitor Paugh for the rest of his shift.").

high level of generality." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

At the same time, this inquiry does not require a "scavenger hunt for prior cases with precisely the same facts." *Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)). Indeed, "a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Id.* (quoting *Halley*, 902 F.3d at 1149). The key question is whether the defendants had "fair warning" that their conduct was unconstitutional. *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

### i.      The Law is Clearly Established

The district court held that the law was clearly established. Relying on our prior decisions in *Sealock*, *Mata*, and *Al-Turki*, the court ruled that "it is clearly established that the actions of prison officials who prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment, constitute deliberate indifference." [27] R. vol. 2 at 55–56 (cleaned up).

---

[27] The district court also stated, in a footnote, that "other courts of appeals have also established that jailers who act with deliberate indifference to the health risks for an inmate undergoing alcohol withdrawal have violated the inmate's constitutional rights." R. vol. 2 at 56 n.16 (citing *Harper v. Lawrence Cnty.*, 592 F.3d

We agree. "[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749. And more specifically, we have said that it is "clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Quintana*, 973 F.3d at 1033.

Other circuits have held the same. *See Williams*, 41 F.4th at 426 ("Officers and jailers have long had notice that they cannot ignore a detainee's serious medical needs."); *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 422 (7th Cir. 2017) (explaining that when "presented [with] obvious symptoms of a serious medical condition . . . , any reasonable officer would know he had a duty to seek medical attention," so if the officers "chose to do nothing despite this duty, they violated 'clearly established' Eight[h] Amendment law"); *Schaub v. VonWald*, 638 F.3d 905, 918 n.6 (8th Cir. 2011) ("This court holds that when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction, a well-established proposition."); *Phillips*, 534 F.3d at 545 ("[W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." (citation omitted)).

---

1227 (11th Cir. 2010) and *Stefan v. Olson*, 497 F. App'x 568 (6th Cir. 2012)). We need not consider whether these cases are sufficient to support clearly established law because, as we explain below, caselaw from our circuit gave the Individual Defendants "fair warning" that their actions were unconstitutional. *Estate of Smart*, 951 F.3d at 1168 (citation omitted).

"We are mindful that we must not define clearly established law 'at too high a level of generality,' but we have seen cases like this before." *Williams*, 41 F.4th at 426 (internal citation omitted). For example, in *Sealock*, a case from 2000, we held that, for purposes of summary judgment, a prison official's refusal to obtain medical assistance for a prisoner who complained that he was having a heart attack and "displayed symptoms consistent with a heart attack" constituted deliberate indifference. 218 F.3d at 1210–11.

Likewise, in *Mata*, a 2005 ruling, we reversed a grant of summary judgment to a nurse because the plaintiff had raised an issue of material fact as to the nurse's deliberate indifference. 427 F.3d at 758. We explained that the nurse had refused to fulfill "her gatekeeping role in a potential . . . emergency by not seeking a medical evaluation" for an inmate, even though the inmate "was suffering from severe chest pains and required medical attention." *Id.* at 756. We reasoned that the nurse's "absolute failure" "to follow the required protocols, contact the appropriate medical personnel, and/or attempt to assist [the inmate] in any fashion" demonstrated deliberate indifference. *Id.* at 758.

Then, in *Al-Turki*, a 2014 case, we affirmed the denial of qualified immunity to a prison nurse who refused to provide medical attention to an inmate complaining of severe abdominal pain. 762 F.3d at 1195. The plaintiff was "a diabetic inmate who had collapsed onto the floor, repeatedly vomited, and complained to different correctional officers of severe abdominal pain." *Id.* at 1194. We held that "severe abdominal pain, particularly in someone with diabetes, may be a sign of any number

47

of serious, life-threatening conditions." *Id.* Thus, the nurse's decision to ignore the request for medical assistance amounted to a constitutional violation. *Id.* at 1195.

Finally, in *Quintana*,[28] we reversed the grant of qualified immunity to a jail official who failed to provide any medical assistance to an inmate who was suffering from heroin withdrawal and throwing up blood. 973 F.3d at 1035. We did so even though the inmate "did not request any further treatment," *id.* at 1027, because the plaintiff had sufficiently alleged that the jail official had "consciously disregard[ed] [the inmate's] obvious symptoms," *id.* at 1033.

These cases are sufficiently analogous to the facts here to have placed the Individual Defendants on notice that disregarding Paugh's obvious and serious medical needs amounted to a constitutional violation. As noted in *Prince*, "[e]ach case involved the denial of medical attention to an individual in custody" who displayed a serious medical need. 28 F.4th at 1048. In addition, *Al-Turki* and *Quintana* involved a plaintiff with "pre-existing medical conditions," like Paugh. *Id.* And most similar to Paugh's situation, *Quintana* involved an inmate exhibiting

---

[28] "This court has recognized that a case decided after the incident underlying a § 1983 action can state clearly established law when that case ruled that the relevant law was clearly established as of an earlier date preceding the events in the later § 1983 action." *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1276 n.8 (10th Cir. 2022) (quoting *Soza v. Demsich*, 13 F.4th 1094, 1100 n.3 (10th Cir. 2021)). So even though *Quintana* was decided in 2020—after the July 2015 events of this case—it "recognized the law [to be] clearly established before that date," *id.*, because it relied on *Mata* and *Sealock*, which were decided before July 2015, 973 F.3d at 1033. *See also Prince*, 28 F.4th at 1047–48 n.10 (relying on *McCowan v. Morales*, 945 F.3d 1276 (10th Cir. 2019)—a case decided in 2019—as clearly established law for events that transpired in 2016 because *McCowan* "surveyed the state of the law in 2015").

withdrawal symptoms, and the jail official knew about the inmate's condition. 973 F.3d at 1027.

At bottom, the district court correctly found that the law was clearly established that when "a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Id.* at 1033.

> ii.        *Counterarguments Against Clearly Established Law*

In response, the Individual Defendants argue that the law is not clearly established for three reasons. First, they contend that clearly established law requires pointing to "cases involving alcohol withdrawal in jails, or at least some sort of withdrawal in jails." Opening Br. at 23. Second, the Individual Defendants argue that these cases are only "applicable to medical professionals and are not applicable to jail officers." *Id.* at 23–24. Last, they argue that if these cases apply to non-medical professionals, "it only clearly establishes the law for prison officials who take no action whatsoever." *Id.* at 24. And because the Individual Defendants "took some action and care" for Paugh, they argue that they cannot be liable for deliberate indifference. *Id.* We address each argument in turn.

> 1. Difference in Factual Contexts

First, the Individual Defendants insist that a finding of clearly established law requires us to identify cases that involve "alcohol withdrawal in jails, or at least some sort of withdrawal in jails." *Id.* at 23.

But, as stated above, the relevant inquiry "in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *Quintana*, 973 F.3d at 1033 (citation omitted). Thus, there need not be "a case directly on point for a right to be clearly established." *McCowan*, 945 F.3d at 1285 (quoting *Kiesla v. Hughes*, 138 S. Ct. 1148, 1152 (2018)); *see also Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1257 n.9 (10th Cir. 1998) ("A plaintiff, however, need not cite a factually identical case to demonstrate the law was clearly established. Some level of generality is appropriate." (internal citation omitted)).

Indeed, we have previously relied on *Sealock*, *Mata*, and *Al-Turki* for clearly established law in factual contexts that differ from those cases. Most prominently, in *Quintana*—a case about heroin withdrawal—we held that *Mata* and *Sealock* clearly established "that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." 973 F.3d at 1033. Likewise, in *Prince*—a case about "severe acute psychosis causing an acute encephalopathy, or brain disease," 28 F.4th at 1041—we held that *Sealock* and *Al-Turki*, among others, clearly established that "disregarding [an inmate's] severe symptoms amount[s] to a constitutional violation," *id.* at 1047–48.

Thus, the lack of a case involving alcohol withdrawal does not preclude us from finding the law to be clearly established.

### 2.  Applicability to Jail Officials

Next, the Individual Defendants argue that *Sealock* and *Mata* are applicable only to medical professionals, not jail officials. We disagree.

50

First, in *Sealock*, we reversed a grant of summary judgment to a defendant jail official because he "refused to transport [the prisoner] immediately to a doctor or a hospital" despite complaints of chest pains. 218 F.3d at 1210–11. Thus, it is not true that *Sealock* involved only medical professionals.

Second, as we explained in *Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021), "lay officials (just like medical professionals) can incur liability for delays in providing medical treatment." *Id.* at 800; *see also Quintana*, 973 F.3d at 1033 (applying *Sealock* and *Mata* as clearly established law to a jail official, not a medical professional).

So "it's not fatal that some of the cited opinions involved medical professionals."[29] *Lance*, 985 F.3d at 799.

### 3.   Whether the Law Applies Only to Those Who Took No Action Whatsoever

Finally, the Individual Defendants argue that if *Sealock* applies to non-medical professionals, it applies only to "prison officials who take no action whatsoever." Opening Br. at 24.

Our decision in *Estate of Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021) addressed this exact argument. There, a nurse argued, just as the Individual Defendants do here, that *Mata*, *Sealock*, and *Quintana* were inapplicable because "unlike the defendants in those cases," she "did something to help" by providing an inmate with Gatorade. *Estate of Jensen*, 989 F.3d at 860.

---

[29] The Individual Defendants' briefing makes no mention of *Al-Turki*.

51

We rejected this argument. *Id.* We held that *Sealock* provided sufficient notice to the nurse that in light of the inmate's serious symptoms, giving the inmate Gatorade instead of calling medical professionals violated the inmate's right to medical care. *Id.* In reaching this conclusion, we pointed out that in *Sealock*, we held that a physician assistant could still be liable for deliberate indifference when he failed to summon an ambulance for an inmate complaining of chest pains—despite having given the inmate a shot of Phenergan. *Id.* (explaining *Sealock*). This was so, we explained, because "when an individual's sole purpose is 'to serve as a gatekeeper for other medical personnel,' and that person delays or refuses to fulfill the gatekeeper role, he may be liable for deliberate indifference." *Id.* (quoting *Sealock*, 218 F.3d at 1211).

So, as in *Estate of Jensen*, the law sufficiently notified the Individual Defendants that even with the little "help" they provided Paugh, their actions (and inactions) would still violate his constitutional rights.

At bottom, since at least 2014, the law has clearly established that "when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Quintana*, 973 F.3d at 1033. Thus, the Estate has satisfied the second prong of the qualified-immunity analysis.

In sum, the Individual Defendants are not entitled to qualified immunity. So we affirm the district court's denial of the Individual Defendants' motion for summary judgment.

## II.    The County

Next, we consider the County's appeal. The district court denied the County's motion for summary judgment, ruling that the Estate had put forth sufficient evidence: (1) of customs and policies; (2) that caused Paugh's constitutional violations; and (3) that the County maintained these customs and policies with deliberate indifference. Thus, it permitted the Estate's claims against the County to proceed to trial. Now on appeal, the County argues that the Estate has neither shown any underlying constitutional violations, nor that "a county policy directly caused a constitutional violation." Opening Br. at 51.

We must first determine whether we have jurisdiction over the County's interlocutory appeal. As explained, individual defendants asserting qualified immunity may immediately appeal a district court's denial of that defense under the collateral-order doctrine. *See Moore v. City of Wynnewood*, 57 F.3d 924, 928–29 (10th Cir. 1995). But municipalities are not entitled to qualified immunity. *Id.* at 929. So they "cannot invoke the collateral order doctrine to justify appeal of an otherwise nonappealable decision." *Id.*

But a municipality may still immediately appeal a district court's denial of its summary-judgment motion by asking us to exercise pendent appellate jurisdiction. *Id.* Pendent appellate jurisdiction allows us to "exercise jurisdiction over an otherwise nonfinal and nonappealable lower court decision [if it] overlaps with an appealable decision." *Id.* In other words, if a municipality's appeal "overlaps" with an individual

53

defendant's appeal challenging the denial of qualified immunity, we may exercise pendent appellate jurisdiction over the municipality's appeal. *Id.*

But "[p]endent appellate jurisdiction is a matter of discretion, not of right." *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994). And we must exercise this discretion sparingly. *Cox*, 800 F.3d at 1256; *see also Est. of Ceballos v. Husk*, 919 F.3d 1204, 1221 (10th Cir. 2019) (explaining that "the exercise of pendent appellate jurisdiction is generally disfavored" (citation omitted)).

Indeed, we may exercise pendent appellate jurisdiction to consider a municipality's appeal only if the appeal raises issues that are "'inextricably intertwined' with the district court's denial of qualified immunity to the individual defendants." *Crowson*, 983 F.3d at 1185. A municipality's appeal is "inextricably intertwined" with the qualified-immunity issues on collateral appeal if resolving qualified immunity would also "*necessarily* resolve[]" the municipality's appeal. *Id.* (emphasis in original); *see also Moore*, 57 F.3d at 930 (explaining that a pendent-appellate claim is "inextricably intertwined" with a "properly reviewable claim on collateral appeal only if . . . the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well" (emphasis in original)). Put simply, if our qualified-immunity ruling would not also resolve all the municipality's issues, then we may not exercise pendent appellate jurisdiction. *See Crowson*, 983 F.3d at 1185.

Here, the crux of the County's appeal is that it cannot be liable because "there is no underlying constitutional violation by a county employee." Opening Br. at 50.

54

But as we've explained, the Estate has shown that a reasonable jury could find the needed constitutional violations because the Individual Defendants are not entitled to qualified immunity. As a result, our ruling on qualified immunity would not resolve the claims against the County. So we lack jurisdiction to consider the County's appeal.[30] *See Crowson*, 983 F.3d at 1185.

## CONCLUSION

For these reasons, we affirm the district court's denial of the Individual Defendants' motion for summary judgment. And we dismiss the County's appeal for lack of jurisdiction.[31]

---

[30] On appeal, the Individual Defendants and the County argue that the Estate's suit should be dismissed for failure to state a claim, and that they may raise this issue at any time, including in their summary-judgment motion. Opening Br. at 51, 55. The district court disagreed, explaining that Individual Defendants had waived their ability to do so because they had answered "over two years before" moving for summary judgment. R. vol. 2 at 36 n.2. We agree with the district court that "the time for properly testing the sufficiency of the complaint [has] passed." *See SEC v. Wolfson*, 539 F.3d 1249, 1265 (10th Cir. 2008) (holding that a defendant's ability to challenge the sufficiency of a complaint had "passed" because he "never raised any objections to the complaint or otherwise sought a more particular statement of the allegations against him until two years after the complaint was filed and months after the parties had moved for summary judgment").

[31] The Individual Defendants and the County also ask us to dismiss any claims based on a violation of the Utah State Constitution, arguing that § 1983 only permits claims based on violations of federal law. But the district court already did so. *See* R. vol. 2 at 133 ("Thus, the court agrees that [the Estate's] Section 1983 claims alleging violations of the . . . Utah Constitution . . . fail to state a claim for relief."). We need not redo what the district court has already done.